# In the United States Court of Federal Claims

No. 11-740 C
(Filed under seal May 11, 2012)
(Reissued May 23, 2012)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| **CBY DESIGN BUILDERS,** * | Pre-award bid protest; Army Corps |
| * | of Engineers; corrective action |
| Plaintiff, * | following GAO recommendation; |
| * | subject-matter jurisdiction; standing |
| v. * | of awardee; mootness; organizational |
| * | conflict of interest; no injury when |
| **THE UNITED STATES,** * | exonerated; ripeness; objection to |
| * | solicitation; deference to GAO |
| Defendant, * | decisions; de novo review for |
| * | questions of law; solicitation |
| **BECHTEL INFRASTRUCTURE GROUP,** * | interpretation; build-to-budget; |
| * | failure to consider important aspect; |
| and * | price a required factor, 10 U.S.C. |
| * | § 2305; evaluation that departs from |
| **PCCP CONSTRUCTORS,  J.V.,** * | solicitation's terms; rational basis for |
| * | GAO decision; injunctive relief |
| Defendant-Intervenors. * | denied. |
| * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

*Amy L. O'Sullivan*, Crowell & Moring, LLP, Washington, D.C., for plaintiff.  *Thomas P. Humphrey, Puja Satiani, Jonathan M. Baker*, and *Sarah B. Gleich*, all of Washington, D.C., of counsel.

*Corinne A. Niosi* and *Barbara E. Thomas*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, all of Washington, D.C., for defendant.

*Marcia G. Madsen*, Mayer Brown, LLP, Washington, D.C., for defendant-intervenor Bechtel Infrastructure Corporation.  *Luke Levasseur* and *David F. Dowd*, both of Washington, D.C., of counsel.

*Neil H. O'Donnell*, Rogers Joseph O'Donnell, Washington, D.C., for defendant-intervenor PCCP Constructors, J.V.  *Patricia A. Meagher, Dennis J. Callahan*, and *Jefferey M. Chiow*, all of Washington, D.C., of counsel.

<u>**OPINION AND ORDER**</u>[1]

WOLSKI, Judge.

This case involves a procurement award for a design-build contract solicited by the Hurricane Protection Office ("HPO") of the United States Army Corps of Engineers ("Corps" or "Agency").  The Corps initially awarded the contract to Plaintiff CBY Design Builders ("CBY"), which is a joint venture of Brasfield & Gorrie, L.L.C., CDM Constructors Inc., and W.G. Yates and Sons Construction Co.  On November 4, 2011, CBY filed a bid protest in our court challenging a decision of the Corps to follow recommendations of the Government Accountability Office ("GAO") and to implement corrective action in accordance with a GAO decision sustaining the protests of unsuccessful offerors.  This corrective action entailed a conflict-of-interest investigation, a stay of the award, amendment of the solicitation, and a resolicitation of proposals for a new evaluation and award.  Bechtel Infrastructure Group ("Bechtel") and PCCP Constructors, JV ("PCCP"), the protesters before GAO, have intervened in this case to defend the Corps's decision to take corrective action.  Plaintiff CBY has moved for judgment on the administrative record, arguing that the GAO decision was arbitrary and capricious, and that therefore the Corps also acted arbitrarily and capriciously by following the GAO's recommendation.  CBY seeks permanent injunctive relief to prevent the Corps from proceeding with the corrective action, as well as an order directing the Corps to proceed with performance under the contract originally awarded to CBY.  The government has moved to dismiss the case, challenging the Court's subject matter jurisdiction and, in the alternative, cross-moved for judgment on the administrative record.  The intervenors also have cross-moved for judgment on the administrative record.

For the reasons that follow, the Court has determined that it lacks subject matter jurisdiction over CBY's challenge to the conflict-of-interest investigation, due to mootness and a lack of standing; and that the GAO's recommendation concerning the evaluation of CBY's foundation design provided a rational basis for the corrective action taken by the Corps.  Thus, defendant's and intervenors' cross-motions for judgment on the administrative record are **GRANTED** and plaintiff's motion for judgment on the administrative record is **DENIED**.

## I.   BACKGROUND

### A.  The Solicitation

The United States Army Corps of Engineers, Hurricane Protection Office, issued Solicitation No. W912P8-09-R-0013 on April 30, 2010.  Admin. R. ("AR"), Tab 3 at 90.  The

---

[1] This opinion was originally filed under seal, with the parties given the opportunity to suggest redactions.  Plaintiff, defendant, and PCCP each proposed redactions, some of which (pertaining to proprietary information, and the names of other offerors and of agency personnel with continuing roles in the source selection) were accepted and others (such as the adjectival ratings of proposals) rejected as unjustified.  Redacted names are replaced by pseudonyms (within brackets), and other redacted text has been replaced in the following manner:  "[XXX]."  The opinion is released for publication, with some minor, non-substantive corrections.

solicitation sought proposals for the construction of a system of Permanent Canal Closures and Pumps to aid in the protection of New Orleans, Louisiana from future flood damage. AR, Tab 3 at 90; AR, Tab 71 at 17447. During Hurricane Katrina, water from Lake Pontchartrain breached the outfall canals at 17th Street and London Avenue, flooding downtown New Orleans. AR, Tab 71 at 17447. Afterward, the Corps installed an interim structure of canal closures and pumps. *Id*. The contract at issue in this litigation is for the design and construction of a permanent replacement for the interim structures on three outfall canals into Lake Pontchartrain. *Id*. The primary goals of the Permanent Canal Closures and Pumps project ("Permanent Canal Project")[2] included achieving a 100-year level of storm-surge risk reduction and allowing rainwater to be evacuated from the city. AR, Tab 3 at 92.

The solicitation established a two-phase source selection for a performance-based, firm-fixed price, design-build contract. AR, Tab 3 at 94; AR, Tab 4 at 776. In the first phase, offerors were evaluated based on their Experience, Technical Approach, and Past Performance, all of which were considered approximately equal in importance during Phase I. AR, Tab 3 at 100-01. On June 1, 2010, the Corps received seven timely Phase I proposals. AR, Tab 11 at 10469. Of the seven proposals received, the Corps selected the five most qualified firms to participate in Phase II. *Id*.; *see also* AR, Tab 1 at 3. The five firms selected for Phase II were CBY, Bechtel, PCCP Constructors, [Offeror A], and [Offeror B]. AR, Tab 8 at 10315; AR, Tab 11 at 10469.

### 1. Phase II Evaluation Criteria

On June 30, 2010, the Corps issued Amendment 4 to the solicitation, which initiated the beginning of Phase II of the procurement process. AR, Tab 4 at 252-53. After one-on-one discussions with each of the five offerors to receive feedback on the RFP requirements, the Corps then issued Amendment 5 on August 12, 2010, which laid out the Phase II requirements and evaluation criteria, and incorporated feedback from the offerors from the one-on-one sessions. AR, Tab 1 at 4; AR, Tab 4 at 709-10. The RFP laid out five main evaluation factors for Phase II. Factor 1, Technical Approach, had five subfactors: pump station operation, operation and maintenance, project execution approach, aesthetics, and adaptability. AR, Tab 4 at 759-64, 776-78. Factor 2, Management Capability, had two subfactors: design and construction management, and key personnel and organization. *Id*. at 764-66, 778. Factor 3 was the Socio-Economic—Small Business Participation Plan, and was to be combined with Factor 3 from Phase I, Past Performance. *Id*. at 767-68, 776, 778. Factor 4 was for Price, which was to be "evaluated for reasonableness" under FAR Section 15.404-1. *Id*. at 769, 778.

The solicitation ranked Factor 1 as the most important factor, and listed its five subfactors in descending order of importance. AR, Tab 4 at 758, 776. Within Factor 2, the two subfactors were "approximately equal in importance." *Id*. The small business participation plan in Factor 3 was "approximately equal in importance" to Factor 3 from Phase I, and when combined they were "less important" than Factor 2 in Phase II. *Id*. The non-price factors when combined were "significantly more important" than the fourth factor for price. *Id*.

---

[2] While the record in this case refers to the project as the "PCCP project," the Court will refer to it as the "Permanent Canal Project" in order to avoid confusion with the intervenor PCCP Constructors.

The RFP instructed offerors to submit their proposals in four volumes.  AR, Tab 4 at 757.
Volume I was to contain the offeror's technical proposal; Volume II would contain the offeror's
small business participation plan; Volume III would contain price information and pro forma
requirements; and Volume IV was to be submitted as an attachment containing supporting
documentation that would serve as an appendix to Volumes I and III.  *Id*. at 757-71.  The RFP
specifically listed Volume IV as "Attachment A" and described it as "Not Evaluated."  *Id*. at
757.  When explaining the instructions for submitting Volume I, the RFP stated that offerors
should provide "a narrative that summarizes their proposed technical solution," and that the
drawings and technical data contained in Volume IV "can be referenced as required."  *Id*. at 759,
760.  The supporting documentation in Volume IV was to include the "design information for
each PCCP and any additional information that is needed to clearly illustrate the scope and
approach of their proposal."  *Id*. at 771.  The items in Volume IV would be used "as supporting
documentation during the evaluation, as referenced by the proposal."  *Id*.

The RFP identified five adjectival ratings that evaluators would use to rate Factors 1 and
2.  AR, Tab 4 at 779.  The possible ratings were "Excellent," "Good," "Acceptable," "Marginal,"
and "Unacceptable."  *Id*.  "Excellent" described proposals that "will clearly result in the superior
attainment of all requirements and objectives"; included "numerous advantageous characteristics
of substance and essentially no disadvantages"; contained solutions that are "exceptionally clear
and precise, fully supported, and demonstrate a clear understanding of the requirements"; and
presented a "very low" risk of unsuccessful performance.  *Id*.  "Good" was the rating for
proposals that demonstrated "a sound approach which is expected to meet all requirements and
objectives"; had "few relatively minor disadvantages"; were expected to result in "satisfactory
performance"; demonstrated "an understanding of the requirements"; and presented a "low" risk
of unsuccessful performance.  *Id*.  Proposals rated "Acceptable" must demonstrate "an approach
which is capable of meeting all requirements and objectives," but contain "both advantageous
and disadvantageous characteristics of substance, where the advantages are not outweighed by
the disadvantages."  *Id*.  Proposals deemed acceptable still demonstrated "a general
understanding of the requirements," had advantages and disadvantages that collectively were
expected to result in "acceptable performance," and posed a "moderate" risk of unsuccessful
performance.  *Id*.  "Marginal" proposals presented an approach that "may not be capable of
meeting all requirements and objectives," had "disadvantages of substance" which outweighed
advantages, were "not likely to result in satisfactory performance," and presented a "high" risk of
unsuccessful performance.  *Id*.  Finally, "[u]nacceptable" proposals would "very likely not be
capable of meeting all requirements and objectives," had "numerous disadvantages of
substance," would not result in satisfactory performance, and presented a "very high" level of
risk that performance would be unsuccessful.  *Id*.

The adjectival ratings for Factor 3 were "Outstanding," "Good," "Acceptable,"
"Marginal," "Susceptible to Being Made Acceptable," and "Unacceptable."  AR, Tab 4 at 780-
81.  "Outstanding" was the rating used for proposals that "achieve or nearly achieve almost all
RFP objectives," had goals that were "highly realistic," presented an "extensive and compelling
rationale" for all proposed goals, and had strengths which "far outweigh weaknesses."  *Id*. at
780.  The "Good" rating was given to proposals that would achieve or nearly achieve most RFP
objectives, had "realistic" goals, provided a "substantive rationale" for almost all proposed goals,

and had strengths that outweighed weaknesses.  *Id.*  "Acceptable" proposals had "meaningful" goals to achieve almost all RFP objectives, provided a "reasonable" rationale for the majority of proposed goals, and whose strengths and weaknesses were "offsetting."  *Id.*  "Marginal" proposals presented meaningful goals for several RFP objectives and had goals that "may not be realistic," gave a "limited rationale" for proposed goals, and had weaknesses which outweighed their strengths.  *Id.* at 781.  The rating of "Susceptible to Being Made Acceptable" was applied to proposals which could not be rated marginal because of an error, but which were capable of being corrected without a major revision.  *Id.*  "Unacceptable" proposals for Factor 3 failed to propose meaningful goals for almost all RFP objectives or failed to satisfy RFP objectives, presented goals that were "not realistic," gave "little or no meaningful rationale" for proposed goals, and had weaknesses which "far" outweighed any strengths.  *Id.*

No adjectival ratings were given for Factor 4, but the RFP reiterated that price would be evaluated for reasonableness under FAR Section 15.404-1.  AR, Tab 4 at 769, 781.  The RFP stated that a "[f]ormal [s]ource [s]election process will be conducted in accordance with FAR Part 15.101 and the Army Source Selection Manual."  AR, Tab 4 at 776.  Evaluations would be made using "the Best Value Continuum – Tradeoff process prescribed by Federal Acquisition Regulation (FAR) Part 15.101."  *Id.*  The Corps stated its intention of selecting an offeror for award without discussions whose proposal "conforms to the solicitation requirements and is determined to be the Best Value to the [g]overnment."  *Id.*

### 2.  *Pricing Language*

One of the issues in this case is the use of the RFP's language regarding the pricing requirements.  Prior to issuing the solicitation, the Corps issued the Synopsis to the Solicitation in March 2010 and modified it on April 23, 2010.  AR, Tab 78 at 17533.  The Synopsis described the build-to-budget concept as setting a budget that was a "ceiling amount," stating:

> . . . this Design-Build project will have a build to budget amount.  The Government's intent is to maximize the best value obtainable for that ceiling amount.  In selecting the winning offer in Phase II, technical non-cost factors when combined are significantly more important than cost/price.  However, the contract award for design and construction shall not exceed the ceiling amount.  The selection process will be structured such that offers that optimize technical/management solutions within the contract budget amount will be viewed more favorably than offers that attempt to trade off performance in favor of lower prices.

AR, Tab 78 at 17534.[3]

---

[3]  Plaintiff repeatedly emphasizes the use of the word "ceiling" in the Synopsis, and the government argues that the Synopsis should not be considered because it was not presented to the GAO, *see* Def.'s Mot. to Dismiss at 52, but the reference to the budget amount being a "ceiling" is also found in other places besides the Synopsis.  *See e.g.*, Tab 10 at 10421 (Summary Price Analysis for Revised Proposals); AR, Tab 11 at 10485 (Source Selection Decision Document); AR, Tab 13 at 10536 (SSAC Memorandum for Record).

The initial solicitation contained a Preamble which stated that the government's contract budget for the design and construction of the Permanent Canal Project was $650,000,000.  AR, Tab 3 at 94.  According to the RFP,

> [o]ffers that exceed the contract budget will be eliminated from the competition without further consideration.  However, the Government desires to maximize the best value obtainable for that amount.  Therefore, Offerors should strive to propose the best technical/management solution within that budget amount. Technical/management approaches that seek to trade off performance in favor of costs below the contract budget amount are not desired and will not be rewarded.

AR, Tab 3 at 94-95; *see also id.* at 112.  This language remained unchanged in Amendment 5, which issued the proposal submission instructions for Phase II in August, 2010.  *See* AR, Tab 4 at 715.  In response to some offerors' concerns that they could not submit proposals within the $650 million budget, the Corps issued Amendment 8 on September 17, 2010, increasing the contract budget amount to $700 million.  AR, Tab 4 at 1243, 1245.  As stated above in the RFP, offers that exceeded the budget amount --- now $700 million --- would be eliminated.  *Id.* at 715.

Amendment 5 to the solicitation contained a section entitled "Questions and Answers" in which the agency's response to offerors' questions included a further description of the pricing approach.  The introduction to the Question and Answer section of the amendment explained that the RFP "was developed to model the best value technique known as 'Build to Budget.'"  AR, Tab 4 at 1223.  According to the Design Build Institute of America (DBIA), the Build to Budget technique is "a method to help owners ensure proposed prices are affordable while further enhancing the focus on technical excellence instead of proposed initial cost."  *Id.*  This explanation continued with the following:

> In this competition, the Government has stipulated the budgeted amount available. In this competition, we expect our solutions to utilize the full budget available and not focus on providing a low bid design.  Attempts to offer lower priced technical solutions may be determined non-competitive and result in elimination accordingly.  Offerors shall maximize the capability of the [Permanent Canal Project] within the available budget.  That is the intent of this acquisition.  DBIA recognizes that Government acquisitions must use price as a factor.  However, the Government has stated that our non-cost factors are significantly more important than price in this competition.

AR, Tab 4 at 1223.  This language is consistent with the RFP's instructions that said offerors "should strive to propose the best technical/management solution within that budget amount," and the RFP warnings that proposals which "seek to trade off performance in favor of costs below the contract budget amount are not desired."  AR, Tab 4 at 758.

In further questions and answers contained in Amendment 10, an offeror expressed concern that even though the budget had been increased to $700 million, the Corps still had not "properly addressed" what actions an offeror could take if its cost estimate exceeded the budget.

AR, Tab 4 at 1412.  The offeror thought it inequitable that the RFP provided a means for an offeror whose cost was less than the budget to simply increase its cost estimate until it equaled the stated budget amount (by including betterments) but did not address what an offeror could do if its estimate exceeded the budget amount.  *Id.*  The Corps's response to this query was simply that "[t]he Offeror's proposal must comply with the RFP requirements."  *Id.*  During discussions with Bechtel on July 15, 2010, the contracting officer allegedly stated in an answer to a question that proposals priced at less than the budget amount would be favorably received.  AR, Tab 44 at 15138 (Lewis Decl.).  After a recess, the contracting officer purportedly returned to clarify that the comment had been a mistake, and that offerors should focus more on providing the best possible value within the budget amount rather than on providing a lower price.  *Id.*

**B.  Evaluation of Proposals and Award of Contract**

*1.  SSEB Evaluations*

On November 15, 2010, the Corps received the initial Phase II proposals from all five offerors.  AR, Tab 1 at 5.  Under the Source Selection Plan, the Source Selection Evaluation Board ("SSEB") was to consist of a chairperson and a team of evaluators and advisors if necessary.  AR, Tab 17 at 11074.  For Phase II, the SSEB was subdivided into four different teams of evaluators --- the technical approach evaluators, the management capability evaluators, the socioeconomic utilization evaluators, and a price team.  AR, Tab 11 at 10470-71; AR, Tab 21 at 12907, 12944.  The SSEB evaluators for each factor convened for several weeks to evaluate each proposal and, based on the evaluations, the contracting officer established the competitive range on December 21, 2010, which included all five offerors.  AR, Tab 1 at 5; AR, Tab 11 at 10475.  The contracting officer determined it was in the government's best interest in order to achieve a "best value" outcome to enter into discussions with all five offerors, invite them to give oral presentations, and then to allow them to submit revised proposals.  AR, Tab 11 at 10475.

The initial SSEB consensus report on December 17, 2010 gave all five offerors a "Marginal" rating for the first sub-factor in Factor 1, the pump station operation.  AR, Tab 8 at 10325; AR, Tab 11 at 10475.[4]  For the second sub-factor in Factor 1, operation and maintenance, Bechtel, [Offeror A], and [Offeror B] received "Marginal" ratings; PCCP received an "Acceptable" rating; and CBY received a rating of "Good."  *Id.*  For Factor 1, sub-factor 3 for project execution approach, CBY, [Offeror A], and [Offeror B] all received "Marginal" ratings, and both Bechtel and PCCP received higher ratings of "Acceptable."  *Id.*  For Factor 1, sub-factor 4 for aesthetics, Bechtel, PCCP, and [Offeror B] received "Acceptable" ratings, while CBY and [Offeror A] received the higher "Good" rating.  *Id.*  For Factor 1, sub-factor 5 for adaptability, CBY, [Offeror A], and [Offeror B] received "Marginal" ratings; PCCP received a rating of "Acceptable"; and Bechtel received the highest rating of "Good."  *Id.*  In Factor 2, sub-factor 1 for design and construction management, CBY and [Offeror A] received "Acceptable" ratings, and Bechtel, PCCP, and [Offeror B] received the higher rating of "Good."  *Id.*  In the second sub-factor of Factor 2, for key personnel and organization, PCCP received only a "Marginal" rating; Bechtel, CBY, and [Offeror A] received "Acceptable" ratings; and [Offeror

---

[4]  The entire initial SSEB report is at AR, Tab 58 at 16820.

B] received the higher rating of "Good."  *Id*.  For Factor 3, Bechtel received an "Acceptable" rating, PCCP received a rating of "Good," and CBY, [Offeror A], and [Offeror B] all received an "Outstanding" rating.  *Id*.

In the initial SSEB report, all five offerors were rated as offering a "Low Risk" in the past performance category carried over from Phase I.  AR, Tab 8 at 10325; AR, Tab 11 at 10475.  All of the offerors except for CBY proposed exactly $700 million in their initial Phase II proposals.  *Id*.  CBY, however, offered a lower price of $674,998,555.  *Id*.

After the initial SSEB evaluation, all five offerors were invited to give two-hour oral presentations over January 18-20, 2011, in order to present an overview of their proposals.  AR, Tab 1 at 5; AR, Tab 11 at 10475-76.  After the presentations, each offeror received a handout with a bullet-point list of the SSEB's conclusions regarding its weaknesses, significant weaknesses, and deficiencies, and requesting clarifications for all non-cost factors.  AR, Tab 1 at 5; AR, Tab 11 at 10476.  Offerors then were allowed to ask questions and discuss any findings which were unclear, and the evaluators asked questions about the offerors' presentations.  AR, Tab 11 at 10476.  On January 22, 2011, each offeror received a letter containing a more detailed description of the "non-cost feedback" from the initial evaluation, price feedback, and a transcript of the question and answer session following the presentations.  *Id*.  After receiving the feedback letter, offerors could call the contracting officer if they needed additional clarification of any of the findings.  *Id*.  On February 7, 2011, the contracting officer closed discussions, and the final proposal revisions for all offerors were submitted on February 14, 2011.  *Id*.

When the SSEB reviewed the revised proposals, the evaluation teams rated each factor and sub-factor a second time using the same adjectival ratings as before.  For Factor 1, sub-factor 1, evaluators rated PCCP and [Offeror B] as "Marginal" for their revised proposals; and Bechtel, CBY, and [Offeror A] received a "Good" rating.  AR, Tab 8 at 10326; AR, Tab 11 at 10477.  In sub-factor 2, all five offerors received a "Good" rating.  AR, Tab 8 at 10326.  For Factor 1, sub-factor 3, Bechtel and [Offeror B] received an "Acceptable" rating; and CBY, [Offeror A], and PCCP all received a "Good" rating.  *Id*.  For sub-factor 4, Bechtel received an "Acceptable" rating, and the other four offerors received "Good."  *Id*.  For Factor 1, sub-factor 5, Bechtel received the highest rating of "Excellent," and all the others received an "Acceptable" rating.  *Id*.  For Factor 2, sub-factor 1, [Offeror B] received a "Marginal" rating, [Offeror A] received an "Acceptable" rating, and Bechtel, CBY, and PCCP each received a "Good" rating.  *Id*.  For Factor 2, sub-factor 2, CBY and [Offeror B] received a "Good" rating, while Bechtel, [Offeror A], and PCCP each received the lower "Acceptable" rating.  *Id*.  All five offerors received an "Outstanding" rating for Factor 3, and they each retained the "Low Risk" rating on Past Performance from the previous evaluation.  AR, Tab 8 at 10326.

Regarding the price factor, the price evaluation team determined whether the proposed prices were fair and reasonable, and --- finding "there was adequate price competition among the offerors" --- the evaluators used FAR Section 15.404.1(b) price analysis procedures.  AR, Tab 21 at 12908; AR, Tab 22 at 13037.  Accordingly, the agency developed an Independent Government Estimate ("IGE") based on each offeror's proposed solution, and evaluated the prices in comparison with the respective IGEs of the other proposals to determine reasonableness.  AR, Tab 21 at 12908; AR, Tab 22 at 13037.  As part of both the initial and final evaluations, the price

team conducted a summary analysis of the price proposals after reviewing each proposal both independently and as a team "to determine pricing anomalies within each proposal." AR, Tab 22 at 12968, 13037.  The summary included the analysis for each contractor and charts comparing the proposals.  *See* AR, Tab 22 at 12967-13024 (Price Evaluation Team Report, December 16, 2010); AR, Tab 22 at 13036-78 (Price Evaluation Team Report, February 25, 2011).[5]

In the revised proposals, Bechtel and PCCP were the only offerors who still proposed a price of exactly $700 million.  AR, Tab 8 at 10326.  CBY maintained its initial price proposal of $674,998,555.  *Id.*  [Offeror A], however, proposed $766,952,258, which the price team recognized "exceed[ed] the $700M ceiling" by $67 million.  AR, Tab 22 at 13057; *see also id.* at 13053; AR, Tab 8 at 10326.[6]  For [Offeror B], the price team found that "a minor math error" resulted in a total price that was slightly higher than the budget amount.  AR, Tab 21 at 12964; AR, Tab 22 at 13066.  [Offeror B]'s proposal also assumed that it would meet the $700 million limit by a [XXX] reduction in costs due to [XXX] that would occur after award --- which meant that [Offeror B] was actually proposing a cost of [XXX], thus exceeding the cost ceiling.[7]  AR, Tab 8 at 10330; AR, Tab 11 at 10477, 10485; AR, Tab 21 at 12964; *see also* AR, Tab 22 at 13066-72.  Based on the price team's report, the contracting officer determined that the "overall prices" offered by CBY, Bechtel, and PCCP were "fair and reasonable," but that [Offeror B]'s and [Offeror A]'s proposals exceeded the budget amount.  AR, Tab 21 at 12965.[8]

The revised proposals, as well as the SSEB's initial findings, were then reviewed by the Source Selection Advisory Council ("SSAC") to identify discriminating characteristics in each factor and sub-factor among the proposals in order to assist the Source Selection Authority ("SSA") in the final decision.  AR, Tab 1 at 6.  According to the Source Selection Plan, the SSAC was to monitor the SSEB and "provide guidance as necessary"; to review the evaluations of the SSEB in order to "validate the strengths, weaknesses and deficiencies prior to or concurrent with the SSA approving a competitive range determination"; and to identify discriminatory factors among offerors to aid the SSA in the selection process.  AR, Tab 17 at 11073.  On March 3, 2011, the SSAC's Memorandum for Record summarized the

---

[5]  The Price Evaluation Team Report for revised proposals, dated February 25, 2011, can also be found at Tab 10, AR at 10420-62, where it is included as Appendix E to the final SSEB Report.

[6]  [Offeror A] offered an alternative proposal for $700 million which would have [XXX], but which consequently did not meet the solicitation's requirements.  AR, Tab 11 at 10482; AR, Tab 21 at 12955; AR, Tab 22 at 13053-54.

[7]  In its Price Analysis Report, the price team listed several assumptions [Offeror B] made in its price proposal and suggested that the contracting officer review them to ensure compliance with the RFP and the FAR.  AR, Tab 22 at 13067.  The contracting officer later confirmed that [Offeror B]'s assumptions included [XXX] reductions in order to maintain the $700M price, as well as [XXX], which presented "a significant risk to the Government."  AR, Tab 21 at 12964.

[8]  The price team's findings were confirmed by the contracting officer in the Price Negotiation Memorandum, which was signed by the contracting officer on April 8, 2011 and was included in the update submitted to the Source Selection Authority.  *See* Tab 21, AR at 12941, 12965.

"discriminators" it found in each sub-factor for CBY, Bechtel, and PCCP, and gave its recommendation on which of the three proposals it deemed to be the strongest, taking the "discriminators" into account.[9]  AR, Tab 13 at 10530-36.  In Factor 1, sub-factor 1, the SSAC found CBY's proposal to be the strongest.  *Id*. at 10531.  For sub-factor 2 in Factor 1, the SSAC also found CBY's proposal to be the strongest, *id*. at 10532, and for sub-factor 3, the SSAC found PCCP's proposal to be the strongest.  *Id*. at 10533.  For sub-factor 4, CBY's proposal was ranked the strongest, *id*. at 10533-34, but for sub-factor 5 the SSAC found Bechtel's proposal to be the strongest.  *Id*. at 10534.  For Factor 2, the SSAC found all three proposals to be equal in the first sub-factor, but for the second sub-factor the SSAC considered CBY's to be the strongest proposal.  AR, Tab 13 at 10535.  For both parts of Factor 3, the socio-economic plan and the past performance, the SSAC found the three proposals to be equal.  *Id*. at 10536.  Regarding price, the SSAC noted that Bechtel and PCCP submitted proposals at the "$700,000,000 ceiling" and identified CBY's price as $674,998,555.  *Id*.  The SSAC concluded that "[a]ll prices were found fair and reasonable," but did not ascribe any particular significance to CBY's price being lower than that of the other two offerors.  *See id*.  On March 10, 2011, the SSAC provided a summary of its findings in a brief to the SSA.  AR, Tab 1 at 6; *see* AR, Tab 12 at 10515-29.

At the SSEB's consensus meeting on April 7, 2011, the SSEB gave each offeror a final overall rating for each factor.  AR, Tab 8 at 10326; AR, Tab 11 at 10477.  In the Technical Approach category, Bechtel, CBY, and [Offeror A] each received an overall rating of "Good," while PCCP and [Offeror B] received an overall rating of "Marginal."  *Id*.  For the second factor of Management Capability, Bechtel, [Offeror A], and PCCP each received an overall rating of "Acceptable," [Offeror B] received a "Marginal" rating, and CBY received an overall rating of "Good."  *Id*.  In the Socio-Economic and Small Business Participation plan factor, all five offerors received an overall rating of "Outstanding."  *Id*.  The past performance and price categories remained unchanged.  *Id*.  The SSEB also wrote summaries of the final evaluations for each of the five offerors.  *See* AR, Tab 8 at 10327-30; AR, Tab 9 at 10384-10490.

### 2.  Source Selection Decision

This procurement was also subjected to agency-mandated peer review.  AR, Tab 1 at 7.  Both a Solicitation Review Board ("SRB") and a Contract Review Board ("CRB") reviewed the acquisition and made comments.  *Id*.; AR, Tab 17 at 11080.  The CRB review began on March 21, 2011, to ensure that meaningful discussions were held and "that the selection was made in accordance with the solicitation procedures, FAR, its supplements, and Corps policy."  AR, Tab 1 at 7.  On April 8, 2011, the SSEB Chairman briefed the SSA on all the CRB findings and resolutions.  *Id*.; *see also* AR, Tab 12 at 10493-10529.  The SSA, [Ms. W], then made the final source selection decision and concluded that CBY's proposal presented the best value to the

---

[9]  The SSAC confirmed the SSEB's determination that [Offeror B]'s proposal included assumptions which rendered the proposed price "in excess of the $700,000,000 RFP ceiling," and that [Offeror A]'s proposal also exceeded the price ceiling --- and thus did not further analyze their strengths and weaknesses.  AR, Tab 13 at 10530.

government.  AR, Tab 11 at 10478.  Accordingly, on April 13, 2011, the Corps awarded the contract to CBY for $675 million.[10]  AR, Tab 5 at 1425.

The SSA concluded that CBY's design included "many advantages," and reflected "a very good, low risk, sound approach for pump station operation . . . expected to result in satisfactory performance."  AR, Tab 11 at 10478.  Moreover, CBY's overall system was designed with "proper consideration of the operation and maintenance requirements as defined in the RFP."  *Id*.  For the other factors and sub-factors, the SSA found overall a low risk of unsuccessful performance and a sound approach expected to meet all requirements and objectives.  *Id*. at 10478-80.  Regarding price, the SSA noted that the price analysis of all offerors "identified some minor level of imbalance," but that the contracting officer determined that any lack of balance in CBY's pricing "d[id] not pose an unacceptable risk to the [g]overnment."  *Id*. at 10480.

The SSA summarized the agency's evaluations for the other four offerors, but explained that [Offeror B] and [Offeror A] had to be eliminated because they each proposed a price that "exceeds the available funding."  AR, Tab 11 at 10492.[11]  In her conclusion, the SSA found that CBY's proposal represented "the strongest technical approach in this competition," *id*. at 10490, and listed CBY's technical strengths in Factors 1 and 2 which she found particularly appealing.  *See id*. at 10490-91.  The SSA also mentioned that "[t]here is a price premium of approximately $25M in the offers from PCCP JV and Bechtel in comparison to CBY."  *Id*. at 10492.  The SSA further concluded that PCCP had "significant weaknesses identified in the most important factor, Factor 1 Subfactor 1," and that PCCP's strengths did not support a $25M premium.  *Id*.  The SSA noted that Bechtel offered several "excellent strengths" but that those features were in the "least important factor" and "do not support a $25M premium.  *Id*.

### *3. Debriefing*

On April 13, 2011, the Corps notified CBY of its award, AR, Tab 5 at 1425, and sent out notices to the four unsuccessful offerors informing them that the contract had been awarded to CBY and explaining the post-award debriefing process.  *See* AR, Tab 61 at 17084-17091.  Both Bechtel and PCCP requested debriefings, which were provided on April 21, 2011.  *See* AR, Tab 62 at 17092; AR, Tab 64 at 17156.  The offerors were given copies of the Source Selection

---

[10]  According to the Source Selection Plan, the SSA was not bound by the SSEB's findings, but the SSA's decision had to have a rational basis in terms of the solicitation's evaluation criteria and had to meet all legal and procedural requirements.  AR, Tab 17 at 11080.

[11]  Despite [Offeror B's and Offeror A's] higher priced proposals, the SSA still included them in her final analysis.  *See* AR, Tab 11, at 10480-85.  The SSA determined that [Offeror A] failed to stay within the RFP's stated budget amount, even though discussions had "reiterated to all offerors the importance of not exceeding the maximum RFP budget."  AR, Tab 11 at 10482.  The SSA also found that [Offeror B]'s assumed reduction in costs due to future [XXX] savings (which would entail a change in the technical solution), along with [Offeror B's] [XXX], presented "a significant risk" to the government, and that [Offeror B] was actually proposing a cost of [XXX].  AR, Tab 11 at 10485.

Decision Document with the confidential information of other offerors redacted, except for CBY's overall ratings and the SSA's discussion of CBY's strengths in the conclusion. *See* AR, Tab 62 at 17098-17123; AR, Tab 64 at 17162-17187. During the face-to-face debriefing, the contracting officer, along with [Mr. X], the technical approach team leader, and [Mr. Y], the management capability team leader, gave feedback from the evaluation teams. AR, Tab 62 at 17098; AR, Tab 64 at 17162. Mister Black explained the source selection process, discussed the offeror's evaluation, and responded to the offeror's questions --- including written questions that had been submitted prior to the debriefing. AR, Tab 62 at 17098; AR, Tab 64 at 17162.

## C. Alleged Organizational Conflict of Interest

On February 14, 2011, before the Corps awarded the contract, Bechtel had raised an organizational conflict of interest ("OCI") concern regarding Richmond Kendrick, an employee of CDM (one of the partners in the CBY joint venture), who had previously worked for the agency on the Permanent Canal Project. AR, Tab 1 at 5; AR, Tab 15 at 10559. Bechtel project manager Michael Lewis told the contracting officer that if CBY were to win the competition, Bechtel would protest based on CDM's hiring of Mr. Kendrick. AR, Tab 1 at 5; AR, Tab 15 at 10559. Richmond Kendrick had been the Chief of Program Execution for the Hurricane Protection Office of the Corps. AR, Tab 15 at 10557. Mister Kendrick was responsible for all HPO projects, and he reported directly to Colonel Robert Sinkler, the HPO Commander. *Id.* Mister Kendrick's role in the HPO involved "oversight and direction of the management processes of the organization; development and execution of project agreements; oversight and direction of program and project managers to establish broad mission requirements and objectives; review of program status; planning for program accomplishment, and providing guidance on manpower and program policy." *Id.* While Mr. Kendrick was aware of requirements and planning for the Permanent Canal Project solicitation and evaluation criteria for the Phase I process, he did not assist in preparing the RFP requirements. *Id.* Mister Kendrick did not attend internal Permanent Canal Project meetings after June 23, 2010, and he retired on August 31, 2010, shortly after Phase II was initiated. *Id.* at 10558. After retiring, Mr. Kendrick accepted a position as a project manager with CDM, a partner in the CBY joint venture. *Id.*

### 1. First OCI Investigation

In response to Bechtel's concern, the Corps conducted an OCI investigation prior to awarding the contract. AR, Tab 15 at 10559. On March 24, 2011, Contracting Officer Timothy Black reported his conclusions that Mr. Kendrick's employment by CDM did not give CBY an unfair competitive advantage, nor give it unequal access to information, and that "[t]here is no reason to believe any type of OCI exists." AR, Tab 15 at 10561. More specifically, Mr. Black determined that Mr. Kendrick had had no involvement with the Permanent Canal Project from June, 2010 until his retirement in August, 2010. *Id.* at 10558. Phase II of the procurement began on June 30, 2010, and the final solicitation amendment prior to submission of Phase II proposals was issued on October 15, 2010, which indicated that Mr. Kendrick had not been involved in developing Phase II of the procurement. *Id.* Mister Black also determined that Mr. Kendrick did not participate in the evaluations of any Permanent Canal Project offerors, that all Phase II evaluations occurred after Mr. Kendrick had left federal service, and that the evaluations were performed by outside individuals who did not know Mr. Kendrick. *Id.* at 10560, 10561.

Moreover, the contracting officer found that Mr. Kendrick sought and received specific written guidance from an agency ethics counselor, before he left the employ of the Corps, concerning restrictions on his post-employment activities.  AR, Tab 15 at 10558.  The written guidance prohibited him from representing CDM/CBY before the Corps, from communicating to the Corps on CBY's behalf, and from disclosing proprietary information or source selection information.[12]  *Id*.  The contracting officer further investigated Mr. Kendrick's role at CBY in the procurement process, conducted interviews with agency personnel involved in the project, consulted with technical advisors and counsel, and reviewed project documents along with FAR provisions and case law.  *Id*. at 10559.  Based on this investigation, Mr. Black concluded that despite a possible appearance of a conflict regarding unequal access to information, no actual conflict existed, as he found no facts suggesting that Mr. Kendrick had access to non-public information unavailable to other competitors.  *Id*. at 10560-61.  Ultimately, Mr. Black determined that Bechtel's concern about an OCI "remains a mere allegation or suspicion for which I have found no actual factual basis."  *Id*. at 10561.

### 2. Second OCI Investigation

On April 25, 2011, after the contract award and debriefing, PCCP Constructors submitted a letter to the contracting officer that provided information regarding a possible violation of the Procurement Integrity Act ("PIA"), 41 U.S.C. § 2102-07 (Supp. IV 2011), again in reference to Mr. Kendrick's involvement with the procurement.  AR, Tab 15 at 10584-85; *see also id*. at 10565; AR, Tab 1 at 8.  The next day, PCCP Constructors filed a GAO protest of the CBY award, which also contained allegations relating to possible PIA violations.  *See* AR, Tab 15 at 10566.   In response, the contracting officer "ordered a review" of his findings from the previous OCI investigation in March, and conducted a second investigation into Mr. Kendrick's role in the Permanent Canal Project procurement.  *Id*.  On May 23, 2011, the contracting officer again concluded that Mr. Kendrick did not have access to non-public, source selection information and had no inside knowledge that unfairly benefited CBY.  *Id*. at 10574-75.  Mister Black determined that the alleged PIA violations which PCCP reported "had no impact on the selection of CBY Design Builders for award of the [Permanent Canal Project] contract," and stated that he "found no evidence supporting" PCCP's allegations.  *Id*.

PCCP's letter to the contracting officer had alleged that Mr. Kendrick had access to source selection information before he worked for CDM, which "likely included" information regarding Phase 1 proposals.  AR, Tab 15 at 10565.  The letter also alleged that CBY's proposal price of $25 million below the budget amount in the RFP strongly indicated that Mr. Kendrick must have disclosed non-public source selection information to CBY regarding the Corps's willingness to accept a lower priced proposal.  *Id*.  PCCP did not offer any evidence to support either of these allegations.  *Id*. at 10566.  In his second Determination and Findings ("D&F"), Mr. Black divided the allegations in the letter and in the GAO protest into four categories for purposes of investigation:  1) whether Mr. Kendrick had broad access to non-public source

---

[12]  The ethics letter also advised him that he could not accept compensation from a contractor for a period of one year if while in government employment he had particular involvement with a contract worth more than $10 million awarded to that contractor.  *See* AR, Tab 15, at 10632.

selection information; 2) whether Mr. Kendrick's role in developing the build-to-budget approach gave him inside knowledge as to how proposals with prices lower than $700 million would be evaluated; 3) whether Mr. Kendrick violated the Procurement Integrity Act by disclosing inside information to CDM; and 4) whether the Corps failed to investigate and take action on the potential conflict of interest created when CDM hired Mr. Kendrick.  *Id*. at 10566-67.

Mister Black then investigated Mr. Kendrick's access to non-public information and concluded that his role while working for the Corps and his participation in the Permanent Canal Project did not give him competitively useful non-public information regarding source selection. AR, Tab 15 at 10567, 10570-71.  Specifically, Mr. Kendrick did not attend meetings related to the Permanent Canal Project's acquisition issues; he did not have access to any Phase I proposals; he did not attend any Phase I SSEB team meetings; he did not have input into the selection of offerors for Phase II; and he was not informed as to which contractors were selected for Phase II.  *Id*. at 10570-71.  Though Mr. Kendrick may have had access to the Source Selection Plan, it did not contain competitively useful non-public information.  *Id*. at 10571. According to the contracting officer's findings, Mr. Kendrick "likely had access" to the Permanent Canal Project acquisition plan, but since it was prepared three and one-half years before the Phase I solicitation was issued it was obsolete and irrelevant.  *Id*.

Mister Black noted that the second category of allegations, regarding Mr. Kendrick's role in developing the build-to-budget approach used in the procurement, was not addressed in the previous OCI investigation because no information had been found at that time to connect him to the pricing issue.  AR, Tab 15 at 10572.  Accordingly, in the second investigation, Mr. Black explained further that Mr. Kendrick was not responsible for the decision to use a build-to-budget technique.  *Id*.  Rather, Ms. Diana Hoag, an expert on procurement and acquisitions employed by Xcelsi Group, acted as an advisor to the HPO in preparing the RFP and first suggested using the build-to-budget approach.  *Id*.  The suggestion was in response to concern over the difficulties of finding additional funding if the offerors' bids came in higher than the amount budgeted.  *Id*. Mister Kendrick did not participate in the drafting of the solicitation's pricing language.  *Id*. at 10573.  Rather, Ms. Hoag provided the initial language for the pricing requirement, a contractor drafted the final language, and the SSA made the final decision to use a build-to-budget approach.  *Id*. at 10572.

Regarding the third and fourth categories, Mr. Black explained that a team which examined the proposal found nothing to indicate that CBY benefited from superior or non-public information that could be attributed to Mr. Kendrick.  AR, Tab 15 at 10573.  According to Mr. Black, the Corps conducted an OCI investigation before awarding the contract to CBY --- which concluded there was no conflict --- and therefore the Corps did not fail to investigate the potential conflict, as PCCP alleged.  *Id*.  As was noted above, Mr. Black finally concluded that the alleged PIA violations would have had no impact on the selection of CBY for the contract award, and found no evidence to support PCCP's allegations.  *Id*. at 10574.

**D. The GAO Protests**

On April 26, 2011, PCCP Constructors and Bechtel filed post-award protests with the GAO challenging the award decision, and the contracting officer accordingly stayed performance on the contract. AR, Tab 1 at 9; AR, Tab 44 at 15066; AR, Tab 45 at 15176. Both Bechtel and PCCP alleged that CBY had an unfair competitive advantage due to CDM's hiring of Mr. Kendrick. AR, Tab 44 at 15068; AR, Tab 45 at 15179. PCCP specifically alleged PIA violations and argued Mr. Kendrick provided sensitive source selection information to CBY. AR, Tab 45 at 15179. Additionally, both PCCP and Bechtel argued that the agency's pricing language had misled offerors to believe that they could not propose a price below $700 million, and that the Corps deviated from the RFP's instructions regarding price and the best value determination when awarding the contract to CBY. AR, Tab 44 at 15067, 15075-81; AR, Tab 45 at 15180, 15210-12. In Bechtel's third supplemental protest, Bechtel argued that the record demonstrated that CBY's proposed foundation and pile design failed to comply with the fixity requirements for lateral loading established by the Hurricane and Storm Drainage Risk Reduction System Design Guidelines ("HSDRRS Design Guidelines"), and that the agency failed to reasonably evaluate this error. AR, Tab 49 at 15693, 15696-15701.[13]

The GAO held a hearing, from June 27 through July 1, 2011, in order to assist the hearing officer in understanding the technical issues and to complete the record --- since there was apparently no contemporaneous documentation of the agency's review of CBY's proposed foundation. AR, Tab 52 (Hearing Transcript) at 16116; AR, Tab 71 (GAO decision) at 17455. One of the main issues at the hearing was Bechtel's argument that the Corps improperly evaluated CBY's proposed foundation concept and should have assessed it as unacceptable regarding the depth of the piles, the way the piles connected to the structure, and the structure's ability to withstand lateral loading. AR, Tab 71 at 17454.

The GAO informed the parties that they would need to provide witnesses to testify concerning the issues relating to the technical evaluation of proposals, and Bechtel provided its technical consultant, Maurice Masucci, as its witness. AR, Tab 71 at 17455. Mister Masucci

---

[13] Bechtel and PCCP raised numerous protest allegations in both their initial and supplemental protests, which the GAO did not include as grounds for its decision. In the initial protest, Bechtel alleged that CBY's technical proposal did not comply with RFP requirements, and argued that the agency unreasonably evaluated the non-price aspects of proposals by treating offerors unequally, unreasonably assigning weaknesses to Bechtel's proposal, and failing to conduct meaningful discussions. AR, Tab 44 at 15067-68. PCCP also alleged that the agency unreasonably evaluated PCCP's technical proposal and incorrectly applied data that resulted in the erroneous assignment of significant weaknesses to PCCP's proposal. AR, Tab 45 at 15179-80. PCCP's supplemental protest additionally alleged that the agency should have assigned CBY a significant weakness for its improper approach to maintaining low water elevation in canals, and that the agency improperly evaluated the proposals regarding the pumps and water flow designs for the London Avenue Canal. AR, Tab 50 at 15805-07. Because the GAO did not sustain the protest on these grounds, however, they are not relevant issues before this Court, and only the specific issues that relate to CBY's protest will be addressed.

was a civil engineer with experience in construction consulting and forensic engineering.  *Id.*  PCCP called engineer Douglas Hamilton to provide testimony relating to its hydraulics issues, primarily concerning the London Avenue Canal.  AR, Tab 52 at 16198.  In response, the agency called Corps employee and hydraulics expert [Mr. Z] to testify concerning the hydraulics issues, *see* AR, Tab 52 at 16146-98, but only provided one witness, [Mr. X], to address all of the other technical issues and to explain how the technical evaluations were conducted.  *See* AR, Tab 52 at 16198, 16222-80.  Mister [X], who served as leader of the technical approach evaluation team for the Permanent Canal Project procurement, was the chief of the Corps's mechanical structural branch and a mechanical engineer.  *Id.* at 16223-24.  The other evaluators on the technical approach team included another mechanical engineer, a structural engineer, a geotechnical engineer, and a hydraulics expert.  *Id.* at 16225; *see also* Pl.'s Mot. J. Admin. R. at 34.  The contracting officer, Timothy D. Black, also testified at the hearing concerning the general evaluation process, though he was not a technical expert.  *See* AR, Tab 52 at 16310-23.

Although several other issues were raised in the hearing by Bechtel and PCCP, the GAO decision focused on hearing testimony regarding the technical evaluation and the OCI issue --- particularly the testimony of Messrs. Masucci and [X] on the former.  *See* AR, Tab 71 at 17454-57, 17463-65.[14]  Mister Masucci testified at the hearing that CBY's drawings indicated that its design was based on a [XXX] connection rather than a [XXX] connection between piles and foundation, and that because [XXX], the structure would not be able to withstand as great a lateral load as it would [XXX].  AR, Tab 71 at 17454 & n.9; AR, Tab 52 at 16282-86.[15]  The GAO also noted that neither CBY nor the agency presented any rebuttal to Mr. Masucci's testimony.  AR, Tab 71 at 17454-55, n.9.

The GAO found it troubling that [Mr. X] repeatedly testified that because he was a mechanical engineer and not a structural engineer, he therefore "had no real understanding" of the technical issues raised in Bechtel's protest.  AR, Tab 71 at 17455, n.10 (citing AR, Tab 52 at 16251, 16260, 16263-64, 16265).  The GAO noted that although [Mr. X] testified the foundation was "very important" to the project and that the ability of the facilities to withstand lateral loads was crucial to the project, [Mr. X] also testified that because of the design-build nature of the contract the SSEB did not evaluate the ability of the structures to meet the guidelines.  AR, Tab 71 at 17455-56 (citing AR, Tab 52 at 16251, 16254, 16260).  Mister [X] testified that the technical evaluation team may have discussed CBY's foundation approach for less than five minutes, and did not evaluate the supporting documentation for the foundation that CBY had referenced in its technical proposal.  AR, Tab 71 at 17456.  Based mainly on this testimony, along with Bechtel's "detailed argument," the GAO concluded that the agency's technical

[14]  The GAO concluded that PCCP failed to "establish a clear basis to find that the agency's evaluation" of proposals with regard to the water flow requirements through the London Avenue Canal was either unreasonable or violated procurement laws or regulations.  AR, Tab 71 at 17469.

[15]  The GAO noted that the solicitation permitted offerors to base their designs on either a pinned or fixed connection, as long as it met the requirements of the HSDRRS Design Guidelines, which require a certain depth of embedment relative to the pile's diameter.  AR, Tab 71 at 17454-55, n.9.

evaluation was "unreasonable and inconsistent with the terms of the RFP," and that the Corps did not meaningfully evaluate CBY's proposed foundation. *Id*. at 17457. The GAO found that the evaluators' approach "was influenced more by a generalized belief about what is required in the evaluation under a design-build procurement than by the actual terms of the RFP," because, according to the GAO, the solicitation "clearly required" the agency to evaluate "the adequacy of the offerors' design provisions to account for structural design loads," yet there was no record showing that the agency did so. *Id*.

The GAO hearing also addressed the OCI allegations, and on that issue Daniel Bradley, the branch chief of the Permanent Canal Project, and Mr. Kendrick testified as witnesses. *See* AR, Tab 52 at 16327-48, 16348-16405. The GAO determined that their testimony revealed several facts about Mr. Kendrick's access to competitively sensitive information, and also his role at CBY, which the GAO found were "hard facts . . . to suggest the existence of a potential, if not actual, OCI that the Corps failed to reasonably evaluate and avoid, neutralize, or mitigate." AR, Tab 71 at 17466. Specifically, the GAO found that the record and the testimony revealed that the Corps failed to reasonably investigate Mr. Kendrick's access to information relating to the build-to-budget solicitation language, and that this failure "taints the integrity of the procurement process." *Id*. at 17467. The GAO concluded that the contracting officer had not conducted a reasonable OCI investigation in the two prior investigations because the scope had been too narrowly focused on Mr. Kendrick's role and did not adequately investigate Mr. Kendrick's access to non-public source selection information. *Id*. at 17462.

The GAO decision also concluded that the agency misled offerors as to how price would be evaluated. AR, Tab 71 at 17459. The GAO's basis for this conclusion was that, despite the inclusion of language in the solicitation indicating that the award would be the result of a best-value tradeoff, four out of five offerors initially proposed prices of $700 million --- which GAO suspected to have resulted from RFP language stating the agency expected offerors to use the full budget amount of $700 million. *Id*. at 17458. Because all but CBY bid $700 million in the initial proposals, GAO believed the Corps should have been aware that only CBY understood the RFP instructions, and yet the Corps failed to explain during discussions that lower prices would be favorably considered. *Id*. Apparently without any further support, the GAO accepted Bechtel's and PCCP's assertions that they "would have allocated resources differently and submitted different proposals" if they had understood the agency would allow prices below $700 million, and therefore found they had been prejudicially misled. *Id*. at 17459.

The GAO issued its decision on August 4, 2011 in *PCCP Constructors Joint Venture; Bechtel Infrastructure Corp*., B-405036 *et al*., 2011 CPD ¶ 156, sustaining the protests on the three grounds described above --- the OCI issue, the price issue, and the foundation evaluation issue --- and recommending corrective action for each issue. Specifically, the GAO recommended that the Corps further investigate the OCI allegations and consider how to mitigate any conflict found to exist. AR, Tab 71 at 17469. The GAO also recommended that the Corps amend the solicitation in order to clarify that its build-to-budget approach allowed offerors to offer prices lower than the budget maximum and, if necessary, to conduct discussions about the technical and price issues considered in the protests. *Id*. at 17469-70. Finally, the GAO recommended that the Corps "accept and evaluate revised proposals, and make a new source

selection decision consistent with" its decision, and directed the Corps to terminate CBY's contract if a different offeror were selected for award. *Id*. at 17469-70.

## E. The Agency's Corrective Action

On August 17, 2011, the contracting officer sent a corrective action letter to CBY on the topic of the GAO's decision that the Corps had not reasonably investigated the allegations concerning Mr. Kendrick. AR, Tab 66 at 17284. The letter noted the concern expressed by the GAO that Mr. Kendrick may have provided CBY "access to non-public, source selection sensitive information." *Id.* The Corps told CBY that it was making an "effort to comply with the recommendations of the GAO and assure that a reasonable investigation is conducted," and accordingly requested that CBY provide information described in a list of ten items. *Id*. at 17284-85. CBY responded on August 31, 2011 with a letter and the ten items the Corps requested. AR, Tab 66 at 17189-17275; AR, Tab 67 at 17292. On September 7, 2011, the Corps asked CBY to provide further information regarding Mr. Kendrick's activities, and CBY again provided the items requested. AR, Tab 66 at 17286, 17276-83.

On September 29, 2011, the contracting officer informed CBY that after conducting a third OCI investigation which included the new information provided, he still had "not identified a potential or actual organizational conflict of interest within the CBY organization," and concluded that there was a "lack of any evidence to establish" that Mr. Kendrick "ever had actual access to any source selection information related to this procurement." AR, Tab 66 at 17289.[16] Despite this finding, however, Mr. Black also expressed he was "deeply concerned about the *inference* that a potential or actual conflict exists," and that the "high-profile nature of this procurement demands a level of transparency" that would assure the public and other offerors that the investigation had been reasonable. *Id*. at 17289. Because of this concern, Mr. Black determined that CBY must agree to ensure that Mr. Kendrick would have no involvement in any future activities related to the Permanent Canal Project procurement, and that CBY must establish a firewall [XXX]. *Id*. at 17289-90.

According to the Determination and Findings of October 7, 2011, the purpose of the third investigation was to "address whether Mr. Kendrick had actual access to proprietary or specific source selection information that would give CBY a competitive advantage" in the Permanent Canal Project procurement. AR, Tab 67 at 17293. Accordingly, the Corps conducted a broader and "more reasonable" investigation regarding the potential OCI than it had previously, and specifically focused on the issues the GAO found problematic. *Id*. at 17292-93. The contracting officer particularly focused the investigation on Mr. Kendrick's access to non-public information, especially regarding the RFP's build-to-budget language, and whether Mr.

---

[16]  This letter was a correction to a letter which Mr. Black had written on September 23, 2011, in which he indicated that the Corps had determined that there was a potential OCI and listed actions the Corps planned to take to mitigate the conflict and "allow CBY to remain in the competition." AR, Tab 66 at 17287. The September 29 letter purported to "correct and clarify the substance" of the letter dated September 23, after "further review and analysis were conducted" which confirmed that no "hard facts" established Mr. Kendrick's actual access to source selection information. AR, Tab 66 at 17289.

Kendrick's role enabled CBY to gain unequal access to competitively useful information. *Id*. at 17292, 17295-98. Contrary to the previous investigations, Mr. Black found that Mr. Kendrick did have "specific knowledge" that offerors could submit proposals below $700 million, and that Mr. Kendrick communicated that knowledge to a member of CBY's proposal team before CBY submitted its bid. *Id*. at 17297. The contracting officer, however, also found that knowledge that bids below $700 million would be considered acceptable was *not* non-public source selection information because the Corps had always intended to communicate that information through the RFP. *Id*. Mister Black further determined that neither Mr. Kendrick's access to this information nor his communications about it to CBY were impermissible, particularly because the agency had intended it to be disclosed to all offerors and believed that it had been adequately disclosed. *Id*. Additionally, Mr. Black concluded that the investigation did not establish that CBY actually relied on Mr. Kendrick's knowledge because it had always been CBY's intent to propose less than the budget amount. *Id*. at 17298. Thus, even though Mr. Black stated that Mr. Kendrick did "provide CBY with unequal access to competitively useful information," Mr. Black concluded that it was not source selection information, and that CBY's access to it was "not due to impermissible conduct." *Id*.

After conducting the third OCI investigation as GAO had recommended, the contracting officer announced that "there are no hard facts to establish that Mr. Kendrick or CBY had actual access to proprietary or source selection information," and that no conflict of interest existed for CBY under the FAR. AR, Tab 67 at 17299. The contracting officer explicitly confirmed his previous PIA Determination and Findings of May 23, 2011 "that found no violation and no impact on the procurement." *Id*. Despite the absence of an OCI, however, Mr. Black acknowledged GAO's finding that the RFP was misleading in how it conveyed the build-to-budget evaluation criterion, and stated that the RFP would be amended to address this concern. *Id*.

On October 21, 2011, the contracting officer sent letters to each of the five Phase II offerors announcing that the Corps would take corrective action to implement the GAO recommendation. AR, Tab 69 at 17308-17. In those letters, the contracting officer explained that the Corps had performed a third investigation as recommended by the GAO and had confirmed its original determination that no OCI existed within the CBY team. *Id*. He also announced that in accordance with the GAO recommendation, "and in order to address the current needs of the agency," the Corps intended to amend the RFP so that new proposals could be accepted and evaluated. *Id*. at 17308, 17310, 17312, 17314, 17316. On October 28, 2011, the Corps sent out additional corrective action letters with a draft of the proposed changes to the RFP. *See* AR, Tab 70 at 17318-17442.

## F. The Protest Filed with the Court

CBY filed a complaint in our court on November 4, 2011, alleging that the Corps's decision to take the corrective action was arbitrary and capricious because the underlying GAO decision was arbitrary and capricious. Compl. ¶¶ 1, 145, 236. CBY's complaint alleged two counts. Count I challenged the agency's decision to implement the GAO recommendation as arbitrary and capricious for the following reasons: because the GAO erroneously concluded that the RFP directed offerors not to bid below $700 million and that offerors were misled to believe

they had to bid exactly $700 million, Compl. ¶¶ 142-56; because the GAO irrationally considered an untimely post-award challenge to a patent ambiguity in the RFP, Compl. ¶¶ 157-64; because the GAO irrationally concluded that Bechtel and PCCP demonstrated prejudice as a result of errors in the price evaluation, Compl. ¶¶ 165-74; because the GAO did not require the establishment of a *prima facie* case of an unfair competitive advantage before recommending further investigation, Compl. ¶¶ 175-83; because there were no hard facts for the GAO to find that an unequal access to information OCI existed, Compl. ¶¶ 184-92; because the GAO improperly determined that the Corps failed to adequately investigate Mr. Kendrick's access to non-public, source selection information, and that the Corps must investigate Mr. Kendrick's role in CBY's proposal, Compl. ¶¶ 193-213; and because the GAO irrationally determined the Corps did not meaningfully evaluate CBY's foundation design, and based this decision on a misreading of the RFP and the failure to give appropriate deference to the agency.  Compl. ¶¶ 214-23.  Count II of the complaint alleged that the Corps's decision to implement the remainder of the GAO recommendation after conducting the third OCI investigation was arbitrary and capricious because the third investigation determined that no OCI existed.  Compl. ¶¶ 224-36.

On November 7, 2011, three days after CBY filed its complaint in this court, PCCP Constructors and Bechtel each filed agency-level protests challenging the Corps's third OCI investigation and findings.  Pl.'s Mot. Suppl. R. Ex. 2 at 1; *see also id.* Ex. 1.[17]  PCCP's protest specifically requested that the agency disqualify CBY for the procurement or appoint a new contracting officer to conduct yet another OCI investigation.  Pl.'s Opp'n to Gov't Mot. to Dismiss ("Pl.'s Opp'n") at 15, Ex. 1 at 5.  Both of the agency-level protests have been stayed pending resolution of the litigation before this Court.  Pl.'s Opp'n Ex. 2 at 1.  Also on November 7, 2011, Bechtel and PCCP each separately moved to intervene in CBY's protest, which was granted without opposition that same day.  Scheduling Order (Nov. 7, 2011).

An administrative record consisting of sixteen volumes of documents, totaling 17,538 pages, was filed by the government on November 16 and November 30, 2011, and further corrected on December 7, 2011.  Plaintiff has moved for judgment on the administrative record, and defendant and intervenors have cross-moved for judgment on the administrative record, with the government adding a motion to dismiss.  Because of the size of the record and the complexity of the issues concerned, the Court allowed the parties to greatly exceed the normal page limits for briefs.  *See* Order (Dec. 13, 2011); Order (Jan. 12, 2012); Order (Jan. 26, 2012); Order (Feb. 10, 2012).

Plaintiff argues that the Corps's decision to implement the GAO's recommended corrective action was arbitrary and capricious because the GAO decision itself was irrational. Pl.'s Mem. of P&A in Supp. Mot. J. Admin. R. ("Pl.'s Br.") at 1-2.  Plaintiff challenged the

---

[17]  The agency-level protests were not included in the administrative record.  The Court first learned of these protests on January 31, 2012, when plaintiff CBY requested leave to submit evidence about them to the Court's record.  *See* Pl.'s Mot. Suppl. R. at 3-5.  The government agreed with plaintiff that this evidence could be admitted as part of the court's record, but opposed its inclusion on timeliness and relevance grounds.  Def.'s Opp'n to Pl.'s Mot. Suppl. R. at 2-4.  Intervenor PCCP also opposed CBY's motion as irrelevant.  PCCP's Opp'n to Pl.'s Mot. to Suppl. R. at 2-5.

rationality of the GAO's determinations concerning three main issues: first, that offerors were misled to believe they had to propose exactly $700 million despite the RFP's express language, Pl.'s Br. at 2, 37-51; second, that the Corps failed to reasonably investigate the OCI allegations regarding Mr. Kendrick's involvement with the Permanent Canal Project, *id*. at 2, 51-74; and third, that the Corps failed to meaningfully evaluate CBY's proposed foundation design. *Id*. at 2, 74-82.

In response, the government moves under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") to dismiss CBY's claims for lack of subject matter jurisdiction. It argues that a challenge to the recommended third OCI investigation is moot, as the investigation has already been completed and did not result in harm to CBY. Def.'s Mot. to Dismiss or Cross-Mot. J. Admin. R. and Resp. to Pl.'s Mot. J. Admin. R. ("Def.'s Br.") at 1, 28-30. Concerning plaintiff's challenges to the other aspects of the corrective action, defendant maintains that these are not yet ripe for review and that CBY lacks standing to bring them until the corrective action is completed and results in the selection of another offeror for the award, Def.'s Br. at 31-36; and also contends that the challenges do not come within our bid protest jurisdiction under 28 U.S.C. § 1491(b)(1). *Id*. at 36-37. In the alternative, the government cross-moves for judgment on the administrative record, arguing that the GAO's recommendation had a rational basis, and therefore the Corps's decision to follow that recommendation was not arbitrary or capricious. *Id*. at 37-66.

Intervenors Bechtel and PCCP, JV also oppose plaintiff's motion and each cross-move for judgment on the administrative record. Intervenors argue that the GAO rationally determined that the Corps's evaluation process was flawed by failing to reasonably evaluate whether CBY's design foundation complied with the requirements, Bechtel's Opp'n to Pl.'s Mot. J. Admin. R. and Cross-Mot. J. ("Bechtel's Br.") at 2-3, 30-41; PCCP Constructors' Opp'n to Pl.'s Mot. J. Admin. R. and Cross-Mot. J. Admin. R. ("PCCP's Br.") at 44-47; by misleading offerors to believe they could not offer proposals priced lower than $700 million, Bechtel's Br. at 3-4, 41-52; PCCP's Br. at 4, 41-44; and by failing to assess the extent of Mr. Kendrick's access to non-public, competitively useful information. Bechtel's Br. at 5, 53-58; PCCP's Br. at 2-3, 23-31 Intervenor PCCP argues that CBY is barred from challenging the third OCI investigation, due to estoppel, waiver, and a lack of prejudice. PCCP's Br. at 19-23. Bechtel contends that by accommodating the Corps's request for additional information regarding the OCI allegations, and by pledging that Mr. Kendrick would not participate in the procurement, CBY has waived any objections to the corrective action. Bechtel's Br. at 54-58. The intervenors also argue that a change in the Corps's needs justifies the corrective action, and that because GAO's determinations were rational and supported by the record before it, the Corps's decision to follow GAO's recommendations was also rational. Bechtel's Br. at 1-5, 52-53; PCCP's Br. at 1-5, 38-56.

After a long and thorough hearing on the parties' motions, *see* Tr. 3-322 (Feb. 23, 2012) ("Tr."), the Court requested supplemental briefing on two issues that arose during the course of the hearing --- the relevance of certain GAO opinions concerning investigations of alleged unfair competitive advantage, and the proper application of deference to the GAO's underlying decision in this matter. *See* Order (Feb. 28, 2012). Concerning the second issue, the Court inquired whether and how much deference may be given to opinions on questions of law, such as

the interpretation of a solicitation.  The parties each filed a supplemental brief the following week.  *See* Pl.'s Resp. to Court's Req. for Supp'l Br. ("Pl.'s Supp'l Br."); Def.'s Supp'l Br.; Bechtel's Post-Hrg. Supp'l Br. ("Bechtel's Supp'l Br."); PCCP Constructors' Supp'l Br. ("PCCP's Supp'l Br.").

## II.  DISCUSSION

### A.  Legal Standards

#### *1.  Bid Protest Jurisdiction*

Bid protests are heard by this Court under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a)-(b), 110 Stat. 3870, 3874 (1996).  28 U.S.C. § 1491(b)(1) (2006).  The relevant provision states that our court:

> . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. §1491(b)(1).  Concerning the last phrase of this provision, "[a] non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction."  *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008).

The Federal Circuit has construed the ADRA term "interested party" to have the same definition as under the Competition In Contracting Act ("CICA"), encompassing "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *see* 31 U.S.C. § 3551(2).  In the context of a pre-award protest, the requisite interest supporting standing and prejudice is established by alleging "a non-trivial competitive injury which can be redressed by judicial relief."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009).  Normally when considering a motion to dismiss --- even one based on the lack of subject matter jurisdiction --- a court must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Pixton v. B&B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002); *Englewood Terrace Ltd. P'ship v. United States*, 61 Fed. Cl. 583, 584 (2004).[18]

---

[18]  The exception, not presented here, is when jurisdictional facts are challenged, as the plaintiff must then demonstrate jurisdiction by a preponderance of the evidence.  *See McNutt v. GMAC*, 298 U.S. 178, 189 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  In examining jurisdictional facts, a court may consider all relevant evidence,

## 2.  Judgment on the Administrative Record in a Bid Protest

The ADRA amendments to the Tucker Act require our court to follow Administrative Procedure Act ("APA") standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

> reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2006).

Based on an apparent misreading of the legislative history, *see Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that the *de novo* review standard of 5 U.S.C. §706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as procurement awards.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ("*Overton Park*").  Instead, courts in those cases are supposed to apply the standard of 5 U.S.C. §706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (applying 5 U.S.C. §706(2)(A)).  *But see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) ("*Domenico Garufi*") (also citing 5 U.S.C. §706(2)(D) as applicable in bid protests).  The "focal point for judicial review" is usually "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even when the matter under review was not the product of a formal hearing.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

---

including material outside the pleadings.  *See Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947); *KVOS, Inc. v. AP*, 299 U.S. 269, 278 (1936); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999); *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985); *Forest Glen Props., LLC v. United States*, 79 Fed. Cl. 669, 676-78 (2007); *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005).

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the Court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp.*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, the Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Overton Park*, 401 U.S. at 416. Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* The court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The Court must determine whether "the procurement official's decision lacked a rational basis," *Domenico Garufi*, 238 F.3d at 1332 (adopting APA standards developed by the D.C. Circuit); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). This entails determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). "The presence (by the government) or absence (by the protester) of any rational basis for the agency decision must be demonstrated by a

preponderance of the evidence." *Gulf Grp.*, 61 Fed. Cl. at 351; s*ee Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Appl'ns Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003). If arbitrary action is found as a matter of law, the Court will then decide the factual question of whether the action was prejudicial to the bid protester. *See Bannum*, 404 F.3d at 1351-54.

The interpretation of a solicitation, as that of contract provisions generally, is a question of law which courts review *de novo*. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (2004); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (2004). Whether a provision in a solicitation is ambiguous, and whether an ambiguity is latent or patent, are also questions of law over which courts exercise independent review on a case-by-case basis. *NVT Techs.*, 370 F.3d at 1159; *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (1996). When interpreting the solicitation, the document must be considered as a whole and interpreted in "a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote Corp*., 365 F.3d at 1353; *NVT Techs*., 370 F.3d at 1159. If the provisions are clear and unambiguous, the Court must give them "their plain and ordinary meaning." *Banknote Corp*., 365 F.3d at 1353.

### 3.  Injunctive Relief

In a bid protest, our court has the power to issue a permanent injunction pursuant to 28 U.S.C. §1491(b)(2). In determining whether to grant a motion for a permanent injunction, the court applies a four-factored standard, under which a plaintiff must show: 1) that it has actually succeeded on the merits; 2) that it will suffer irreparable harm if the procurement is not enjoined; 3) that the harm suffered by it, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and 4) that granting injunctive relief serves the public interest. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *Mobile Med. Int'l Corp. v. United States*, 95 Fed. Cl. 706, 742-43 (2010). None of the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 378 (2009). Conversely, the lack of an "adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors," to deny the injunction. *Chrysler Motors Corp. v. Auto Body Panels, Inc. v. United States*, 908 F.2d 951, 953 (Fed. Cir. 1990). A lack of success on the merits, however, obviously precludes the possibility of an injunction. *See Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 268 (2011); *Gulf Grp.*, 61 Fed. Cl. at 364.

## B.  Jurisdictional Issues

### 1.  The Challenge to the Third OCI Investigation is Moot, and CBY Lacks Standing to Enjoin a Process that Exonerated It

In the first count of the complaint, CBY alleged that the Corps's decision to follow the GAO recommendation and conduct a third OCI investigation was arbitrary and capricious.

Compl. ¶¶ 183, 192, 204, 213; *see also* Pl.'s Br. at 51; Pl.'s Reply in Supp. Mot. J. Admin. R. ("Pl.'s Reply") at 16.  Underpinning this claim are CBY's allegations in Count I.B that the GAO irrationally determined that the prior OCI investigations were too narrow in scope, and that the recommendation to further investigate a potential OCI was therefore arbitrary and capricious. Compl. ¶¶ 175-213.  According to plaintiff, the GAO decision in this regard was irrational because GAO failed to give due deference to the contracting officer's findings in the two previous investigations; because the build-to-budget information was public knowledge; because GAO applied the wrong standards; and because there were no hard facts to support the conclusion that Mr. Kendrick had access to non-public, competitively useful information.  Pl.'s Br. at 52-72.

The government has moved to dismiss CBY's claims for lack of subject matter jurisdiction.  Regarding the corrective action relating to the OCI issue, the government contends that CBY's challenge to the third OCI investigation is moot because the investigation has already been completed, and resulted in a favorable outcome for CBY.  Def.'s Br. at 25-26, 27, 28-30. The government also argues that CBY lacks standing to challenge the third OCI investigation because the investigation did not cause any injury to CBY that this court could redress.  *Id.* at 26-27, 29-30, 35-36.

In response, CBY argues that the agency-level protests filed by Bechtel and PCCP demonstrate that the OCI matter is still a live controversy, with the results of the third investigation thus still open to challenge.[19]  Pl.'s Opp'n at 16-17.  Plaintiff notes that PCCP's protest seeks to have CBY disqualified from the procurement, and thus if PCCP is successful this will cost it the contract already awarded and exclude it from competing under the resolicitation. *Id.* at 16-18; *see* Def.'s Reply in Supp. Mot. to Dismiss at 2 ("Def.'s Dism. Reply").

The mootness of a case is properly the subject of an RCFC 12(b)(1) motion.  "The inability of the federal judiciary 'to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'"  *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (quoting *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964)); *Technical Innovation, Inc. v. United States*, 93 Fed. Cl. 276, 278 (2010).  Thus, mootness presents a question of subject matter jurisdiction.  *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971).  When a matter before this court is subject to review by the Federal Circuit, an Article III court, *see* 28 U.S.C. §§ 1295(a)(3), 2522; *see also Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed. Cir. 1990), mootness is not merely a matter of prudence.  *Technical Innovation,* 93 Fed. Cl. at 278.  Rather, each "case or controversy," 28 U.S.C. §§ 2517, 2519, which Congress has placed under the jurisdiction of both our court and the Federal Circuit must necessarily meet the Article III justiciability requirements.

---

[19]  While it is not in the administrative record, plaintiff CBY has moved to supplement the *Court's* record with a copy of PCCP's agency-level protest and a declaration concerning CBY's counsel's knowledge of the Bechtel counterpart.  *See* Pl.'s Mot. to Suppl. R. at 1-2, Ex. 1, Ex. 2. Because these documents address the issue of prejudice, which often cannot rest on matters in an administrative record, *see East West, Inc. v. United States,* 100 Fed. Cl. 53, 57 (2011); *PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 4-5 (2009); *AshBritt*, 87 Fed. Cl. at 366-67, plaintiff's motion to supplement the Court's record is **GRANTED**.

*See Technical Innovation,* 93 Fed. Cl. at 278; *Am. Mar. Transp., Inc. v. United States*, 18 Cl. Ct. 283, 290-91 (1989); *Welsh v. United States*, 2 Cl. Ct. 417, 420-21 (1983).

As a question of jurisdiction, mootness is an exception to "the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties." *F. Alderete Gen. Contractors, Inc. v. United States*, 715 F.2d 1476, 1480 (Fed. Cir. 1983).[20]  The Supreme Court has explained that "jurisdiction, properly acquired, may abate if the case becomes moot," *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) --- which happens when it is unreasonable to expect "that the alleged violation will recur," and when "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (citations omitted).  In other words, a case will be moot where it no longer presents a "live" controversy or the parties no longer have a "'legally cognizable interest in the outcome'" of the litigation.  *See Rice Servs., Ltd. v. United States*, 405 F.3d 1017, 1019 n.3 (Fed. Cir. 2005) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)); *see also Davis*, 440 U.S. at 631; *Technical Innovation,* 93 Fed. Cl. at 279; 15 James Wm. Moore et al., *Moore's Federal Practice* § 101.90 (3d ed. 2009).

Moreover, plaintiff must also demonstrate that it has been prejudiced by the Corps's decision to conduct the third investigation, in the context of standing.  *See Info. Tech. & Appl'ns Corp. v. U.S.*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  In bid protests, prejudice "is a necessary element of standing," and in all cases "standing is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009).  Under the ADRA, an offeror has standing to challenge procurement decisions that affect its "direct economic interest," *see Am. Fed'n of Gov't Employees*, 258 F.3d at 1302 (borrowing the definition from 31 U.S.C. §3551(2)), which in a pre-award protest requires alleging "a non-trivial competitive injury which can be redressed by judicial relief."  *Weeks Marine*, 575 F.3d at 1363.

The Court is not persuaded by CBY's arguments that the Corps's decision to follow the GAO recommendation and conduct a third OCI investigation may be challenged in this bid protest.  The complaint on its face alleges that the third OCI investigation has been completed and resulted in the contracting officer's determination that no actual or potential OCI existed. *See* Compl. ¶¶ 3, 27-29, 97-106; *id.* Exs. 2 & 3.  Assuming that CBY is correct in alleging that the GAO was arbitrary and capricious in recommending that the Corps should conduct a third investigation, the Corps completed that investigation and concluded that no OCI existed to preclude CBY from competing for or being awarded the Permanent Canal Project contract.  Had the investigation resulted in the opposite conclusion, and plaintiff's award were accordingly cancelled, that investigation --- and possibly the rationality of the GAO recommendation that spawned it[21] --- could certainly be the subject of a bid protest.  But the result of the Corps's

---

[20]  In the other direction, jurisdictional questions of ripeness are not based on the state of affairs at the time of filing, as subsequent events may make a matter ripe.  *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974).

[21]  The intervenors maintain that CBY waived the ability to challenge the decision to conduct a

allegedly arbitrary decision to conduct a third investigation is the further exoneration of CBY and Mr. Kendrick.  *See* AR, Tab 67 at 17291-99.

In his Determination and Findings for the third investigation, the contracting officer stressed that the proposed amendment to the solicitation relating to the build-to-budget evaluation criterion "will correct the perceived errors in the RFP as identified by the GAO and *is not in response to any claims or assertions about the alleged existence of an OCI*."  AR, Tab 67 at 17299 (emphasis added).  The corrective action letters sent out to offerors stated that the Corps "has reconfirmed its original determination that no Organization Conflict of Interest exists within the CBY team," and does not link the third OCI investigation to the decision to amend the solicitation and to accept for evaluation new proposal revisions.  *See* AR, Tab 69 at 17308-17; Compl. Ex. 2.  The government concedes that the result of the third OCI investigation cannot be the basis for the decision to stay the contract award to CBY and conduct a recompetition.  Def.'s Br. at 30; Tr. at 141.  Thus, even if the Corps had irrationally followed an arbitrary recommendation from the GAO, this has resulted in a final decision that has not injured CBY. The recommendation has already been followed, it is not reasonable to believe that it can "recur," and the result of the third investigation has "completely and irrevocably eradicated the effects of" any error in following the recommendation.  *Davis*, 440 U.S. at 631.  Any challenge by CBY to the decision to conduct a third investigation is now moot.

The Court does not find that the pendency of the intervenors' agency-level protests, *see* Pl.'s Opp'n, Exs. 1-2, brought under 48 C.F.R. § 33.103, affects the mootness analysis.  Plaintiff maintains that the conclusion of the third investigation has given the intervenors another reason to challenge the finding that no OCI existed, prolonging litigation and delaying the performance of the contract it was awarded.  Pl.'s Opp'n at 16-17; Tr. at 19-20.  Although it is true that, had there been no third investigation, there could be no agency-level protest of the result of that investigation, this does not mean that intervenors' continued protests are dependent on the existence of that investigation.  Had the Corps decided not to follow the GAO recommendation and not to conduct a third investigation, the intervenors could have protested *that decision* at the agency level, or in our court as part of a protest of any award to CBY.  Thus, any looming risk to CBY's award is not the product of the third investigation, but rather of the intervenors' determination to protest.  These protests may be inconvenient for CBY, but unless the government violates some statute or regulation in accepting the protests for filing, it is hard to see how our bid protest jurisdiction is remotely implicated.  The ADRA is not a mechanism for the removal to our court of protests filed elsewhere, *cf.* 28 U.S.C. § 1446 (providing for removal of civil actions to district courts), and speculation about the potential results of agency-level

_____

third OCI investigation by willingly participating in it, relying on the Federal Circuit's decision regarding the timeliness of challenges to patent errors in the terms of a solicitation.  *See* PCCP's Br. at 19-21 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313-15 (Fed. Cir. 2007)); Bechtel's Br. at 54-58 (same).  The government takes the position that the rationality of the GAO recommendation and the results of the subsequent investigation could be challenged together in a protest of a decision to disqualify an offeror.  Tr. at 139.  The resolution of the government's RCFC 12(b)(1) motion takes precedence over the intervenors' merits arguments, which are rendered moot by the decision on the former.

protests is not itself an injury to the direct economic interests of the plaintiff.  To be sure, if those protests are decided against CBY, and it is excluded from competition for the Permanent Canal Project contract, then there would exist a decision by the Corps that could be challenged in our court.  But that would be a different decision, and a different protest.

For the same reasons described above, the Court concludes that CBY lacks standing to challenge the Corps's decision to conduct a third OCI investigation.  The decision to follow the GAO recommendation resulted in the further exoneration of CBY and Mr. Kendrick, *see* AR, Tab 67 at 17291-99, and thus is not an impediment to CBY receiving its contract award.  And there is no connection between the decision to conduct a third investigation and the portions of the corrective action calling for new revised proposals to be evaluated for a new award.  *See* AR, Tab 69 at 17308-17; Compl. Ex. 2.  The decision to follow the GAO recommendation concerning the OCI investigation, arbitrary or not, has imposed no competitive injury upon CBY.

Accordingly, the government's motion to dismiss CBY's claims relating to the third OCI investigation, for lack of subject matter jurisdiction, is **GRANTED**.  The challenge has been rendered moot by the contracting officer's decision in CBY's favor, and plaintiff has not been injured by this decision either directly (as CBY was not disqualified from award) or indirectly (as the remainder of the corrective action does not rest upon it), and thus lacks standing to protest the investigation.

### 2.  *The Rest of the Corrective Action is Ripe for Judicial Review*

Concerning the remaining, non-OCI aspects of the agency's decision to take corrective action, the government moves for dismissal for lack of subject matter jurisdiction, on three grounds.  *See* Def.'s Br. at 31-37.  Under the first ground, defendant argues that these matters are not ripe for review.  *Id*. at 31-35.[22]  The ripeness doctrine prevents courts from deciding hypothetical, abstract, or contingent claims.  As the Supreme Court has explained:

---

[22]  Whether a motion to dismiss on ripeness grounds should be viewed as a question of jurisdiction rather than a failure to state a claim has been a matter of contention, as some ripeness considerations, such as the finality of a decision, are "prudential" and not derived from Article III of the Constitution.  *See White & Case LLP v. United States*, 67 Fed. Cl. 164, 168 (2005) (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733-34 (1997)); *see also Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972) (explaining that due to ripeness considerations "even when jurisdiction exists it should not be exercised").  In a case involving the challenge to a substantive rule issued by an agency, the Federal Circuit broadly held that "ripeness is a jurisdictional consideration that the court may address sua sponte."  *Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1316 (Fed. Cir. 2006) (citing *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003), which in turn cited *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 n.18 (1993)).  Although the Supreme Court opinion that was ultimately the basis for the Federal Circuit's decision rested upon a misstatement of a prior Supreme Court holding, *compare Catholic Soc. Servs.*, 509 U.S. at 57 n.18 (stating "[e]ven when a ripeness question in a particular case is prudential, we may raise it on our own motion") *with Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974) (explaining "we cannot rely upon concessions of the parties and must determine whether the issues are ripe for decision

its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).

In order to determine whether a claim is ripe for review "a twofold inquiry must be made: first to determine whether the issues tendered are appropriate for judicial resolution, and second to assess the hardship to the parties if judicial relief is denied at that stage." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162 (1967); *Abbott Labs*, 387 U.S. at 149. These two prongs are typically referred to as fitness and hardship. Generally, a case is fit for review when the legal issues presented are not ones for which the court could "benefit from further factual development," and the court does not risk inappropriate "interfere[nce] with further administrative action." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). The hardship prong is met when the challenged decision has an impact that is "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Labs*, 387 U.S. at 152.

Concerning the fitness prong, the government argues that the decision of the agency to follow the GAO's recommended corrective action is not a sufficiently "final" agency action that may be challenged at this time, as it is the beginning and not the consummation of a decision-making process. Def.'s Br. at 32. Defendant primarily relies on *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352 (Fed. Cir. 2008) ("*TKS*"), a case that states "it is clear that non-final agency action is not ripe for review," *id*. at 1362, and that quotes the following test for finality:

As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'

*TKS*, 529 F.3d at 1362 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted)); *see* Def.'s Br. at 32. The government also relies on *Madison Services, Inc. v. United States*, 90 Fed. Cl. 673 (2009), an opinion from our court that in turn relies on *TKS* and *Bennett*. *See* Def.'s Br. at 33; *Madison Servs.*, 90 Fed. Cl. at 678-79. The Court notes that the *TKS* statement concerning "non-final agency action" rests on two sources:  a Federal Circuit case involving review under the APA, which is limited to "final agency action" unless a statute

---

*in the 'Case or Controversy' sense*") (emphasis added), the Circuit's decision seems to settle the matter, and ripeness will be treated as a jurisdictional question regardless of the considerations at issue.

otherwise makes action reviewable, *U.S. Ass'n of Imps. of Textiles & Apparel v. U.S. Dep't of Commerce*, 413 F.3d 1344, 1349-50 (Fed. Cir. 2005) ("*USA-ITA*"); and the provision of the APA requiring final agency action unless a suit is otherwise allowed (5 U.S.C. § 704). *See TKS*, 529 F.3d at 1362.

As is discussed below, the Court doubts that ripeness precedents which focus on the existence of a final agency action under the APA have much, if any, relevance to the question of whether a bid protest is ripe. But in any event, a decision challenged under our bid protest jurisdiction would need to be sufficiently final to affect the "direct economic interest" of an actual or prospective offeror for that offeror to be an "interested party" eligible to challenge the decision. *See Am. Fed'n of Gov't Employees*, 258 F.3d at 1302. With that in mind, the Court is persuaded by the five precedents relied upon by CBY that the corrective action being challenged is a final agency action reviewable under our bid protest jurisdiction,[23] and finds the precedents cited by the government to be distinguishable.

To recap our situation, after CBY was awarded a contract on April 13, 2011, *see* AR, Tab 61 at 17084-91, protests filed with the GAO resulted in the August 4, 2011 recommendation that the Corps conduct a new OCI investigation, amend the solicitation to clarify the approach to price, conduct discussions regarding the issues in those protests "if necessary," "accept and evaluate revised proposals, and make a new source selection decision consistent with" the GAO decision. AR, Tab 71 at 17469-70. After the third OCI investigation was completed, on October 21, 2011, the Corps contacted the five offerors in the competitive range to inform them that no OCI existed; that "[i]n accordance with the recommendation from GAO, and in order to address the current needs of the agency, it is [the Corps's] intent to request, accept, and evaluate new proposal revisions from all short listed offerors"; and that it "intends on issuing an Amendment to the solicitation which will make" at least eight changes to the solicitation. *See* AR, Tab 69, at 17308-17. The following week, per its proposed schedule, the Corps sent a draft of the proposed amendment to the offerors, which was to be issued in final form one month later after comments were to have been received and considered. *See* AR, Tab 70, at 17318-17442. One week later, on November 4, 2011, CBY filed its protest here.

As plaintiff has persuasively explained, several opinions of our court have found bid protests ripe in similar circumstances. Looking first at the fitness prong, in *Centech Group* our

---

[23] *See* Pl.'s Opp'n at 5-8 (citing *Sys. Appl'n & Techs., Inc. v. United States*, 100 Fed. Cl. 687 (2011); *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 173 (2011); *Sheridan Corp. v. United States*, 95 Fed. Cl. 141 (2010); *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303 (2010); and *Centech Grp., Inc. v. United States*, 78 Fed. Cl. 496 (2007)). Of course, decisions from our court are merely persuasive authority. *See Vessels v. Sec'y Dep't Health & Human Servs.*, 65 Fed. Cl. 563, 569 (2005). Because our jurisdiction is both nationwide and exclusive concerning most matters, our judges have a functional reason, perhaps, to be more resistant to such persuasion than other federal trial courts --- as the Federal Circuit as a practical matter has no alternative source of judicial decisions it can consult in those matters. *Cf. F. Alderete Gen. Contractors v. United States*, 715 F.2d 1476, 1479 (Fed. Cir. 1983) ("We are aware of the advantage which an appellate court has in resolving an issue where the ground has been well plowed in the conflicting decisions of a lower court.").

court rejected the argument that corrective action in which a contract award was suspended and the solicitation amended for a new competition was not ripe until an award was made to a party other than the awardee protesting the action. *Centech Grp., Inc. v. United States*, 78 Fed. Cl. 496, 505 (2007). The court explained that the corrective action was "distinct from any future evaluation and award" and involved "different controversies than those which may arise from the new evaluation and award in the post-award landscape." *Id.* In *Ceres Gulf*, the same ripeness argument was rejected in a case differing from *Centech Group* only in that the contract award was terminated. *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 317 (2010). The relevant decision to be consummated for purposes of review was found to be the decision to *conduct* a new competition, not the decision to award a contract under the second competition. *Id.* Similarly, our court in *Sheridan Corp.* found corrective action, in the form of a request for revised proposals, final for purposes of a bid protest, as it was the rationale for having the new competition that was at issue. *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 150 (2010). In *Jacobs Technology Inc.*, our court followed the reasoning of *Ceres Gulf*, finding the decision to re-solicit a contract the plaintiff had already won to be a final decision "which effectively voided its previous decision." *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 173, 177 (2011). And in *Systems Application & Technologies, Inc.*, our court found the fitness prong of the ripeness test satisfied by an announced decision to terminate an award, amend a solicitation, and allow revised proposals --- as the decision was not tentative or interlocutory, and affected the legal rights and obligations of the plaintiff to perform the contract previously awarded. *Sys. Appl'n & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 709-10 (2011).

These decisions also found the hardship prong met by the protests of the corrective actions. The immediate impact of corrective action decisions which effectively nullify or terminate a contract award and require the protester to compete a second time have been recognized to include the burden of having to win the same contract twice, *see Jacobs Tech.*, 100 Fed. Cl. at 177; *Sheridan Corp.*, 95 Fed. Cl. at 150; *Ceres Gulf*, 94 Fed. Cl. at 317; the time, effort, and expense of recompeting, *see Sys. Appl'n*, 100 Fed. Cl. at 710; *Jacobs Tech.*, 100 Fed. Cl. at 177; the delay in performing and earning income under the awarded contract, *Sys. Appl'n*, 100 Fed. Cl. at 710; and the disadvantage due to one's proposal information having been revealed to other offerors, *id.*; *Sheridan Corp.*, 95 Fed. Cl. at 150. The possibility that an attempt to object to the corrective action decisions in a post-award protest could be found (or at least be challenged as) untimely under the Federal Circuit decision in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), has been identified as an additional source of hardship. *See Sys. Appl'n*, 100 Fed. Cl. at 710; *Jacobs Tech.*, 100 Fed. Cl. at 177 & n.8; *Sheridan Corp.*, 95 Fed. Cl. at 150; *Ceres Gulf*, 94 Fed. Cl. at 317-18; *Centech Grp.*, 78 Fed. Cl. at 505.

The Court agrees with this now-long list of precedents which hold that corrective actions requiring an awardee to compete a second time for a contract are ripe for our review. The relevant decision that must be consummated for our purposes, *see Bennett*, 520 U.S. at 178, is the decision to have another competition for the award. It is not disputed that this competition will be held if plaintiff's protest fails. Absent this corrective action decision, CBY would either be performing the contract today, or defending its award in a bid protest initiated by the intervenors. Thus, the decision to take corrective action has had legal consequences, precluding plaintiff from performing the contract or resolving the propriety of its award. No additional

factual development is needed, for the alleged arbitrariness concerns not the second evaluation process, but rather the decision to undertake that process. Entertaining plaintiff's protest would not "inappropriately interfere with further administrative action," *Ohio Forestry Ass'n*, 523 U.S. at 733, for the simple reason that if the decision to recompete the contract were an arbitrary one, there is no need for any further such action. Withholding judicial review of the corrective action decision would result in hardship to plaintiff, assuming, as we must, that its well-pled allegations are true, *see Scheuer*, 416 U.S. at 236, as the benefits under the contract already awarded to CBY would be arbitrarily delayed while plaintiff was needlessly forced to expend additional resources to attempt to win the contract a second time.

The government's argument that an agency's procurement decision is not ripe for challenge until the agency decides to award a contract to another offeror, *see* Def.'s Br. at 34; Def.'s Dism. Reply at 8, cannot be reconciled with the ADRA, which clearly gives our court jurisdiction over actions "objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract," and which emphasizes that we possess "jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1). The argument is also contrary to Federal Circuit precedent requiring that protests alleging patent errors in a solicitation's terms must be brought before the deadline for submitting offers. *See Blue & Gold Fleet*, 492 F.3d at 1313. Nor, for that matter, can the argument be squared with the Federal Circuit's decision in *Centech Group*, a case in which an awardee's contract award was suspended while revised proposals were solicited for a new evaluation. *See Centech Grp.*, 554 F.3d at 1035. The Federal Circuit affirmed our court's decision, concluding the agency "acted properly when it followed GAO's recommendation to solicit revised proposals." *Id.* at 1039. Although, as discussed above, the government had moved to dismiss the protest as unripe, *Centech Grp.*, 78 Fed. Cl. at 505-06, no ripeness (or other jurisdictional) concerns are mentioned in the opinion.[24]

Defendant relies heavily on the Federal Circuit opinion in *TKS*, *see* Def.'s Br. at 32-34, which concerned a challenge to a decision of the Department of Commerce to reopen an administrative proceeding which had previously resulted in the revocation of an antidumping order. *TKS*, 529 F.3d at 1357-58, 1362-64. At issue was an "advance notification" that the so-called sunset review would be reopened "approximately 30 days after publication." *Id.* at 1363 (quoting 71 Fed. Reg. 11,590, 11,591-92 (March 8, 2006)). The Federal Circuit explained that the "stated intention to reopen" was a statement that "leaves room for Commerce to change course," and thus was not yet "'formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* (quoting *Abbott Labs.*, 387 U.S. at 148-49). Moreover, the hardship prong was not satisfied even by the reopening, as "at this juncture TKS faces no 'legal or practical effect, except the burden of responding to the charges made against it.'" *Id.* at 1364 (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980)). Thus, the court found there was no final agency action satisfying the APA requirements for review, *see* 5 U.S.C. § 704, just an "intention to reopen" that imposes minimal administrative burdens. *TKS*, 529 F.3d at 1363-64.

---

[24] Although such "drive-by jurisdictional rulings" are not normally taken to be precedential, *see Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 91 (1998), the Federal Circuit has stressed the need to explicitly consider jurisdictional issues in bid protests. *See Info. Tech. & Appl'ns Corp.*, 316 F.3d at 1319.

In contrast, in this case the contracting officer has officially informed the offerors, in two letters, of the corrective action that is actually *being taken*. *See* AR, Tab 69, at 17308-17; AR, Tab 70, at 17318-17442. The agency has decided to "follow the course of action recommended by GAO," AR, Tab 69, at 17308, 17310, 17312, 17314, 17316. While the government maintains that the award to CBY has not officially been cancelled, it has effectively been cancelled --- as CBY, under the corrective action, will only be the awardee if it wins the contract again with a revised proposal in response to an amended solicitation. Unlike the parties attempting to challenge agency action in *TKS* and the cases that opinion relied upon --- a business facing the prospect of the reimposition of antidumping duties, *TKS*, 529 F.3d at 1358; a business being investigated for unfair methods of competition, *Standard Oil*, 449 U.S. at 234, 241; and an association objecting to petitions that sought to restrict the importation of Chinese textiles, *USA-ITA*, 413 F.3d at 1345-46 --- here CBY has suffered a practical, legal effect of the corrective action, as it is not performing a contract it has won. The parties in the other cases lost nothing until the administrative proceedings were complete, but here the right to perform a contract has been denied and the costs of preparing and submitting a proposal have been reimposed on the awardee --- costs which, the Court notes, have legal significance, as they are expressly awardable in a bid protest action. *See* 28 U.S.C. § 1491(b)(2).[25]

The Court also disagrees with the government's argument that the circumstances considered in the *Madison Services* decision are similar to those presented in this case. *See* Def.'s Br. at 33. The former case was brought by an "intended awardee," *Madison Servs.*, 90 Fed. Cl. at 676, who was objecting to a "stated intention, informally related to plaintiff via FEMA's counsel," that the agency decided to follow a GAO recommendation. *Id.* at 679. No action was identified "to implement or even to formalize this decision," which the court found to be tentative. *Id.* The protest was filed but nine days after the GAO recommended reopening the subject competition, and six days after plaintiff was informally informed of the agency's intention. *Id.* at 676. This case, in contrast, involves an actual awardee, objecting to corrective action formally announced by the contracting officer in letters dated seventy-eight and eighty-five days after the GAO's decision was issued. *See* AR, Tab 69, at 17308-17 (corrective action letters dated Oct. 21, 2011); AR, Tab 70, at 17318-17442 (corrective action letters dated Oct. 28, 2011); AR, Tab 71, at 17443 (facsimile transmission sheet of GAO decision, dated Aug. 4, 2011). The timing of these communications is significant because of the following requirement of agencies involved in GAO protests:

> If the Federal agency *fails to implement fully the recommendations* of the Comptroller General under this subsection with respect to a solicitation for a contract or an award or proposed award of a contract *within 60 days after receiving the recommendations*, the head of the procuring activity responsible for that contract *shall report* such failure to the Comptroller General *not later than 5 days after the end of such 60-day period.*

---

[25] The situations would be comparable if CBY merely faced an investigation --- say, a fourth OCI proceeding --- which could result in contract termination, while it continued to perform the contract.

31 U.S.C. § 3554(b)(3) (2006) (emphasis added).  In *Madison Services*, the agency still had fifty-one days to decide not to fully implement the GAO decision, at the time the complaint was filed challenging the informal intention to follow the recommendations.  Here, the corrective action letters were sent more than two weeks after the agency was required to consummate a decision to fully implement the GAO recommendation, and they memorialize a decision to "follow the course of action recommended by GAO."  *See* AR, Tab 69, at 17308-17.[26]  The absence of any report to the Comptroller General, in the administrative record, announcing a failure to fully implement the GAO recommendations confirms that the corrective action was a final, non-tentative decision to follow them.[27]

In any event, the government's focus on cases concerning the presence of "final agency action" satisfying the requirements of the APA appears to the Court to be misplaced.  Under the APA, the agency actions that are reviewable are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Thus, the "final agency action" ripeness cases reflect just a subset of the cases that may be brought under the APA, which also embraces all manner of pre-enforcement review prescribed statutorily by Congress.  *See Ohio Forestry Ass'n*, 523 U.S. at 737; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003) (explaining how immediate review statutes displace the normal APA ripeness test).  Moreover, the Federal Circuit has held that the only portion of the APA incorporated by reference into the Tucker Act by the ADRA was the "arbitrary or capricious standard of review of [title 5] section 706(2)(A)."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004).  The Circuit found that the APA standard of relief, which contains the term "agency action," was not incorporated into 28 U.S.C. § 1491(b)(4).  *Id.*  The Tucker Act provisions governing bid protests do not themselves make reference to "agency action," final or otherwise.  Indeed, the provision incorporating the APA standards describes the subject matter of a bid protest as "the agency's *decision*."  28 U.S.C. § 1491(b)(4) (emphasis added).

Congress has specifically placed matters within our bid protest jurisdiction that seem incompatible with an APA "final agency action" definition that rules out the "tentative or interlocutory."  *Bennett*, 520 U.S. at 178.  We have jurisdiction over objections to solicitations by

---

[26]  The facsimile notations on the copy of the GAO decision in the record indicate that it might have been transmitted (and, presumably, received) on August 5, 2011, the day after the decision (and cover sheet) was dated.  AR, Tab 71, at 17443-70.  This would mean that the first corrective action letter was sent seventy-seven days after receipt of the GAO decision.

[27]  The Court does not find the other precedents cited by the government to be relevant or persuasive.  One, an unpublished opinion of the Federal Circuit, found that a contract awardee had standing to protest the resolicitation of its contract, and thus, if anything, would seem to support the plaintiff's position.  *See Roxco, Ltd. v. United States*, 185 F.3d 886 (Fed. Cir. 1999) (table), 1999 WL 160608, at *2.  The other concerns an attempt to enjoin a hearing that was to determine whether deportation deferrals should continue, *see Karake v. U.S. Dep't of Homeland Sec.*, 672 F. Supp. 2d 49, 53-54 (D.D.C. 2009), and, like *TKS*, involved no legal or practical effect on the plaintiffs until a decision resulted from the hearing.

the government, including challenges to the terms of the documents used to solicit offers, *see Blue & Gold Fleet*, 492 F.3d at 1313, when these documents are constantly amended.  We have jurisdiction over objections to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), which includes the decision *not to procure* items through competitive bidding.  *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).  Thus, even were the definition of "agency action" contained in the APA somehow relevant to bid protests, such protests would more naturally be considered to involve "[a]gency action made reviewable by statute," 5 U.S.C. § 704, eligible for immediate judicial review.  *Cf. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 n.4 (2003) (dicta recognizing that the Tucker Act "authorizes immediate judicial relief from certain types of agency determinations" in bid protest actions) (internal quotation and alteration marks omitted); *id.* at 820 (Breyer, J., dissenting) (explaining that the Tucker Act "specifies that prospective bidders for Government contracts can obtain immediate judicial relief from agency determinations" including solicitations for bids and any "'violation of statute or regulation in connection with a procurement or a proposed procurement'") (quoting 28 U.S.C. § 1491(b)(1)).

### 3.  Plaintiff has Standing to Challenge the Corrective Action

The government also moves to dismiss the case on the ground that CBY has "yet to suffer any injury or loss of direct economic interest," and thus lacks standing to pursue the matter.  Def.'s Br. at 35.  The corrective action announced by the agency, "to follow the course of action recommended by GAO," includes amending the solicitation, requesting and evaluating new proposal revisions, and necessarily making a new award.  AR, Tab 69, at 17308-17.  The GAO did not recommend terminating CBY's contract unless "an offeror other than CBY is selected for award" after the second competition is completed.  *See AR*, Tab 71, at 17470.  But CBY has gone from being the awardee, ready to begin performance on the contract (or to help defend against a bid protest in our court) to just one of the offerors, who must compete again.  Unlike the more typical pre-award bid protest, where the challenge occurs before proposals are received and evaluated, *see Weeks Marine*, 575 F.3d at 1361, here we know that *but for* the decision being challenged, CBY *would be* the awardee.  If the loss of a substantial chance of being an awardee is a sufficient economic interest to support standing, then the loss of the certain chance of being the awardee (even if a substantial chance of winning the new competition remains) should also be sufficient for purposes of standing.  *See Centech Grp.*, 78 Fed. Cl. at 504. The Federal Circuit has found that an offeror who had a substantial chance at receiving a large portion of contracts through sealed bidding but an uncertain chance at receiving them as task orders possessed the requisite economic interest to support standing.  *Weeks Marine*, 575 F.3d at 1362.  The Court finds the impact of the corrective action on CBY to be similar.

If, as CBY alleges, it is arbitrarily being required to win the same award twice, this is certainly the sort of non-trivial competitive injury sufficient to support its standing to object to the corrective action.  *See Centech Grp.*, 78 Fed. Cl. at 504; *Sheridan Corp.*, 95 Fed. Cl. at 149; *Jacobs Tech.*, 100 Fed. Cl. at 178; *Sys. Appl. & Techs.*, 100 Fed. Cl. at 708.  By effectively changing this competition from a single- to a double-elimination tournament for all offerors in

Phase II but CBY, the Corps has inflicted sufficient competitive injury upon plaintiff to support the protester's standing to challenge this change.[28]

### 4.  CBY's Objection to a Solicitation for Proposals is within Our Jurisdiction

The government's third ground for dismissing the case rests on the argument that CBY's protest of the corrective action is not within our ADRA jurisdiction, because plaintiff is not challenging the legality of any terms of a solicitation.  *See* Def.'s Br. at 36-37.  But our jurisdiction is not limited to challenges to the actual document known as the solicitation, but rather extends to the action of soliciting proposals --- it is over objections "to a solicitation *by* a Federal agency for bids or proposals for a proposed contract."  28 U.S.C. § 1491(b)(1) (emphasis added).  This basis for jurisdiction has been clearly identified in the complaint.  *See* Compl. ¶ 4. The purpose of the corrective action is to solicit new proposal revisions for evaluation and contract award.  *See* AR, Tab 69, at 17308-17.  Thus, the Court finds the corrective action to be "a solicitation by" the Corps for "proposals for a proposed contract," 28 U.S.C. § 1491(b)(1), and CBY's protest need not be addressed to the terms of a soliciting document to be within our jurisdiction.  *See Ceres Gulf*, 94 Fed. Cl. at 315-16; *Jacobs Tech*, 100 Fed. Cl. at 175-76; *Sys. Appl. & Techs.*, 100 Fed. Cl. at 703-05.

## C.  Does the Deference Given to Decisions of the GAO Include Deference on Questions of Law, Such as the Interpretation of a Solicitation?

The decision of the Corps to resolicit revised proposals for the contract previously awarded to CBY rests on two independent determinations --- that the "offerors were misled as to how price would be considered in this procurement," AR, Tab 71 at 17459; and that the evaluation of proposals failed to comply with an RFP requirement that "the agency . . . evaluate the adequacy of the offerors' design provisions to account for structural design loads."  *Id*. at 17457.  Our court's review of such decisions, under the deferential APA "arbitrary and capricious" standard, *see* 5 U.S.C. § 706(2)(A), is usually straight-forward.  Following the variation of the "hard-look doctrine"[29] that the Federal Circuit has made applicable to bid protests, an agency's procurement decision may be found arbitrary and capricious when "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (alteration in original).

---

[28]  Additional competitive injury that would be suffered by CBY were it arbitrarily to be required to win the award a second time includes the disclosure to competitors of not just the price it proposed, *see* AR, Tab 61, at 17084-91, but also the summary of its strengths, *see* AR, Tab 62, at 17121-22; AR, Tab 64, at 17185-86.  Plaintiff has not been given the same information regarding its competitors.  *See* AR, Tab 63, at 17131-55.

[29]  *See* Cass R. Sunstein, *Deregulation and the Hard-Look Doctrine*, 1983 Sup. Ct. Rev. 177, 178, 181-84, 194-96 (1983).

Under this approach, our court may not "substitute its judgment for that of the agency," but instead looks to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Emery Worldwide Airlines Inc., v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) (quoting same). In this inquiry, we do not second-guess the decisions being reviewed, and concern ourselves less with *what* was decided and more with the *why* supplied by the agency --- which "involves verifying that objective elements contained in the agency's analysis . . . correspond to the evidence in the record . . . and checking to see if subjective judgments are reached elsewhere in the analysis that contradict the evaluators' conclusions . . . making the decision too 'implausible.'" *USfalcon v. United States*, 92 Fed. Cl. 436, 462 (2010) (citations omitted); *see also Tech Sys.,* 98 Fed. Cl. at 247.

Two complications are present in this case, however. First, in deciding to resolicit revised proposals, the Corps was "taking steps to follow the course of action recommended by GAO" in the ruling on intervenors' prior protests. AR, Tab 69, at 17308, 17310, 17312, 17314, 17316. Thus, the Court is called on to review the rationality of GAO's decisions that the Corps acted unreasonably, rather than the rational basis of the latter's actions. Second, underlying the GAO decisions may be its interpretation of the Permanent Canal Project solicitation. The interpretation of a solicitation is a question of law, and is given independent, *de novo* review by the Federal Circuit in bid protests. *NVT Techs., Inc.*, 370 F.3d at 1159; *Banknote Corp. of Am.*, 365 F.3d at 1353. Since GAO decisions may be treated by our court as persuasive authorities on questions of law, *see Orion Int'l Techs. v. United States*, 66 Fed. Cl. 569, 573 (2005); *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 503 (2005), the Court requested supplemental briefing to address whether the GAO should receive the same deference for its interpretation of solicitation terms that it gets when it applies that interpretation to the facts found. Order (Feb. 28, 2012).

The government maintains that when an agency decides to follow the recommendation resulting from a GAO bid protest, our review of a protest of that corrective action utilizes a different standard than usually applies. Def.'s Supp'l Br. at 7. In such cases, the protest concerns whether the GAO "decision itself was irrational." *Honeywell v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). The government argues that the Federal Circuit's description of this review as requiring "appropriate deference" and not permitting the "independent *de novo* determination of" the issue decided by GAO, *see id.* at 647, 649, places such matters under a different standard than the Circuit employs to review our court's decisions in this area. Def.'s Supp'l Br. at 6-7. Defendant cites our court's decision in *Jacobs Technology Inc. v. United States*, 100 Fed. Cl. 186, 190-95 (2011), as exemplifying this purportedly different approach. Def.'s Supp'l Br. at 7 & n.2.

These arguments are echoed by the intervenors. Bechtel contends that although questions of law are usually decided by courts *de novo*, the "different posture" of a case involving the implementation of a GAO recommendation, where "the GAO decision is the focus of review," does not allow *de novo* consideration of any aspect of the decision being protested. Bechtel's Supp'l Br. at 2-5. And PCCP Constructors argues that it is a "special situation when this court

reviews an agency's decision to follow the GAO's recommendation," PCCP's Supp'l Br. at 5, because of a "high degree of deference, based on the GAO's special role and expertise." *Id.* at 6. It further contends that the Federal Circuit's decision in *Honeywell*, rebuking what it perceived as the *de novo* review of the responsiveness of bid documents, shows that questions of law are not independently determined in such proceedings. *Id.* at 7-8 (discussing *Honeywell*, 870 F.2d at 647).

Plaintiff, on the other hand, focuses on the well-settled principle that our court is not "bound by the views of the Comptroller General." Pl.'s Supp'l Br. at 7 (quoting *SP Sys., Inc. v. United States*, 86 Fed. Cl. 1, 12-13 (2009) (citing *Burroughs Corp. v. United States*, 223 Ct. Cl. 53, 63 (1980))). It argues that the questions of law are still for our court to decide, even if a bid protest involves review of a GAO decision. *Id.* at 8. In support of its position, CBY cites two opinions from our court which expressly refused to defer to the GAO on questions of law --- one involving statutory interpretation, *Grunley Walsh Int'l, LLC v. United States*, 78 Fed. Cl. 35, 38-39 (2007), and the other interpretation of a solicitation, *Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 626 & n.17 (2002), although neither involved the protest of corrective action following a GAO recommendation. *See* Pl.'s Supp'l Br. at 8.

After carefully reviewing the supplemental briefs and relevant authorities, the Court concludes that defendant and intervenors are mistaken in their assertions that a special standard of review applies when a bid protest challenges corrective action taken in accordance with a GAO recommendation. Statements that our review is not *de novo* do not distinguish these circumstances from any other bid protest, as review is always under the deferential APA "arbitrary and capricious" standard rather than *de novo*.[30]  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380-82 (Fed. Cir. 2009). Nor is there any significance to descriptions of our review as concerning the rationality of the GAO's *decision*, as bid protests always involve such review of a decision. *See* 28 U.S.C. § 1491(b)(4) (requiring that "courts shall review the agency's *decision* pursuant to the standards set forth in section 706 of title 5" (emphasis added)); *Domenico Garufi*, 238 F.3d at 1332 (explaining that under the APA standards a protest may succeed if "the procurement official's *decision* lacked a rational basis" (emphasis added)).

What is different in cases when an agency follows a GAO recommendation is not that a decision is being reviewed for rationality, but *whose* decision matters in this review. When the relevant procurement official (usually the contracting officer) decides to adopt the views of the GAO after a protest has been heard by that body, this agency decision is not considered inherently unreasonable (for departing from the agency's previous position) nor invulnerable (under the shield of GAO authority), but is instead measured by the rationality of the recommendation it follows. Instead of deferring to the *initial* agency decision, and re-reviewing the protest that was brought in the GAO by scrutinizing the rationality of the initial decision, we defer to the *second* agency decision, and scrutinize the rationality of the GAO's resolution of the protest it heard. But the review standard does not change because of the GAO's involvement.

---

[30]  The Court recognizes, however, that this state of affairs is based on the Supreme Court's misreading of legislative history. *See Gulf Grp.*, 61 Fed. Cl. at 350 n.25 (criticizing *Overton Park*, 401 U.S. at 415).

*See Centech Grp.*, 554 F.3d at 1037 (quoting the APA standard as described in *Domenico Garufi*, 238 F.3d at 1332).

When the GAO *denies* a bid protest, and finds the agency decision reasonable, the GAO decision drops out of the equation when a subsequent protest is brought in our court. *See Data Mgmt. Servs., J.V. v. United States*, 78 Fed. Cl. 366, 371 n.5 (2007) (explaining that the GAO decision "is given no deference"); *All Seasons Constr., Inc. v. United States*, 55 Fed. Cl. 175, 177 n.1 (2003).[31]  The Court is not aware of any Federal Circuit opinions in which the GAO's seal of approval brings with it any enhanced deference toward the agency decision --- after these opinions note the GAO's denial of a protest, the GAO decisions do not figure into the Circuit's analysis. *See, e.g.*, *Ala. Aircraft*, 586 F.3d at 1374-76; *Axiom Res. Mgmt.*, 564 F.3d at 1378, 1381-84; *Tip Top Constr., Inc. v. United States*, 563 F.3d 1338, 1341-47 (Fed. Cir. 2009); *Info. Tech.*, 316 F.3d at 1317, 1319-24.  In the admittedly rare case in which the GAO sustains a protest but the agency chooses not to follow that office's recommendation, it seems the agency's initial procurement decision (not the decision to eschew the recommendation) would be the topic of a resulting bid protest in court, and the deference given the agency's decision is not reduced due to the GAO's disagreement. *See Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201-02 (D.C. Cir. 1984) (Scalia, J.) ("regard[ing] the assessment of the GAO as an expert opinion, which we should prudently consider but to which we have no obligation to defer" and "reject[ing the] contention that every decision of the GAO should be adopted and enforced by the court unless that decision lacks a rational basis").

Since the amount of deference given to an agency decision under the "arbitrary and capricious" standard of review does not change when the GAO denies a protest of the decision, or when the GAO sustains a protest but its recommendation is not followed, it is hard to see how this deference would be altered by an agency's decision to follow a GAO recommendation.  No "special" amount of deference, covering questions of law as well as the ultimate decision being reviewed, can be gleaned from the three Federal Circuit precedents concerning the review of such corrective actions. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383-87 (Fed. Cir. 2011); *Centech Grp.*, 554 F.3d at 1036-40; *Honeywell*, 870 F.2d at 647-49.

In *Honeywell*, the Federal Circuit explained that the expectation that agencies, under CICA, would defer to recommendations of the GAO, shifted the focus of bid protests to the rationality of the GAO decision when these recommendations were being followed. *Honeywell*, 870 F.2d at 647-48.  Instead of conducting the deferential, rational basis review under the APA standards, our court was found to have "impermissibly undert[aken] what can fairly be

---

[31]  Some confusion on this point might result from dictum in *Allied Technology Group, Inc. v. United States*, 649 F.3d 1320 (Fed. Cir. 2011) ("*Allied Tech. Grp. II*"), which inaccurately suggested that our court had reviewed the GAO's denial of a protest. *See id*. at 1322, 1326; *cf. Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 23-24, 38-50 (2010) (reviewing the actions of the contracting officer).  But in its holdings, the Federal Circuit was clearly reviewing the decisions of the agency's contracting officer. *Allied Tech. Grp. II*, 649 F.3d at 1330 (explaining "this court affirms the Contracting Officer's decision"), 1331 (finding "the Contracting Officer did not lack a rational basis"), 1333 (twice determining that the contracting officer "had a rational basis," and "affirming the government's award of the contract").

characterized only as its own independent *de novo* determination of whether the bid documents identified [one particular company] as the bidder." *Id.* at 647. In other words, our court second-guessed the judgment of the GAO as to whether the bid was responsive to the solicitation. The case did not involve the interpretation of a solicitation, but rather of the bid submitted by the awardee. If the interpretation of bids or proposals were considered a legal question, then every bid protest involving the evaluation of bids or proposals would turn on legal questions, evading deference. The Circuit treated the issue as a factual (or perhaps mixed) question, faulting our court for "its own weighing and evaluation of" bid documents, *id.*; finding "the Comptroller General's decision . . . had ample support in the bid documents," *id.* at 648, and "was supported by numerous statements in the bid documents," *id.* at 649; and determining that our court "failed to give appropriate deference to the GAO's conclusion that" two documents had not "contained *evidence* that the" awardee had itself entered into a joint venture. *Id.* (emphasis added). From this, one cannot conclude that the Court must defer to the GAO's views on questions of law, such as the interpretation of a solicitation. *Cf. Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997, 999 (Fed. Cir. 1996) (in an appeal of a Brooks Act protest from the General Services Administration Board of Contract Appeals, holding that the interpretation of a solicitation is a question of law, but the "determination that a proposal meets a particular Solicitation provision" is a question of fact).

In *Centech Group*, another case involving the interpretation of an awardee's offer, the Federal Circuit makes no mention of any special deference to the GAO recommendation. *See Centech Grp.*, 554 F.3d at 1036-40. The Circuit invoked the typical "arbitrary and capricious" APA standard employed in bid protests, *see id.* at 1037 (quoting *Domenico Garufi*, 238 F.3d at 1332), and noted that in appeals of bid protests "we apply the 'arbitrary and capricious' standard of § 706 anew, conducting the same analysis as the Court of Federal Claims." *Id.* Rather than simply deferring to GAO's interpretation of FAR provisions, the Federal Circuit noted these were "not binding" but "are instructive in the area of bid protests." *Id.* at 1038 n.4. The Circuit concluded that "[t]he record fully supports GAO's determination." *Id.* at 1040.

The Federal Circuit's decision in *Turner Construction Co. v. United States*, 645 F.3d 1377 (Fed. Cir. 2011), also contains no language from which one can conclude that special deference, extending to questions of law, applies when GAO recommendations were followed by an agency. References to review as "deferential" and not *de novo*, *id.* at 1384, do not set this type of bid protest apart from others. Moreover, the Federal Circuit's placement of the GAO under the rule --- based on the APA's "arbitrary and capricious" standard, *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 --- that "[w]hen an officer's decision is reasonable," the body considering a protest cannot "substitute its judgment for that of the agency," suggests a shift in the legal landscape that is incompatible with deference on questions of law. *See Turner Constr.*, 645 F.3d at 1383.

The Court also does not find the numerous references in opinions to the "deference" to be given GAO decisions in the procurement area as supporting the ceding to GAO of our normal role in deciding questions of law. The term "deference" is used to mean we will consider the GAO's views for their persuasiveness, a consideration which rarely extends to non-judicial opinions. *See United States v. Mead Corp.*, 533 U.S. 218, 227-28, 234-35 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944). To go further than this and, in effect, give *Chevron*

deference to the GAO's opinion on a question of law, *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984), seems particularly inappropriate when that question is the interpretation of a solicitation. Under *Chevron*, when more than one reasonable interpretation exists for statutory language, an agency's selection of one of them will be honored by courts. *See id.* But if our court were limited to merely verifying that the GAO's interpretation of a solicitation is *a reasonable one*, as part of a rational basis review, this ignores the possibility that more than one interpretation could be reasonable --- despite the significance of ambiguity in a solicitation, particularly when it is patent (both questions of law). *See Blue & Gold*, 492 F.3d at 1313-15; *NVT Techs.*, 370 F.3d at 1159; *Banknote Corp.*, 365 F.3d at 1353; *Grumman Data Sys.*, 88 F.3d at 997.

Nor does the Court find that the *Honeywell* opinion's invocation of the Court of Claims decision in *John Reiner & Co. v. United States*, 163 Ct. Cl. 381 (1963), supports deferring to the GAO on questions of law. *See Honeywell*, 870 F.2d at 647-48 (citing *John Reiner & Co.*, 163 Ct. Cl. at 390). The latter, pre-FAR decision was premised upon the Comptroller General's "general concern with the proper operation of competitive bidding in government procurement," and noted that GAO "can make recommendations and render decisions that, *as a matter of procurement policy*, awards on contracts should be cancelled or withdrawn *even though they would not be held invalid in court*." *John Reiner & Co.*, 163 Ct. Cl. at 386 (emphasis added). Any deference based on the GAO's policymaking role would not seem to survive the Federal Circuit's determination that the office cannot "substitute its judgment for that of the agency" in bid protests. *Turner Constr.*, 645 F.3d at 1383. And the decision of Congress, through CICA, to codify the GAO's role in the procurement process, *see Honeywell*, 870 F.2d at 648, has since been matched by its decision, in the ADRA, to give our court exclusive trial court jurisdiction over procurement bid protests --- which we have now exercised for more than eleven years. *See Banknote Corp.*, 365 F.3d at 1350. Thus, while we may still find the opinions of the GAO to be persuasive, given its important role and considerable expertise in this area, our court has also developed expertise in the government procurement field.

There is nothing about interpreting a solicitation that makes it a question of law only in the hands of the Federal Circuit. Indeed, in *Banknote Corp.*, a pre-*Bannum* decision that reviewed a bid protest decision of our court under the summary judgment standard, the Federal Circuit explained that "judgment on the administrative record is often an appropriate vehicle" for our use --- since protests "typically involve" such questions of law as "the correct interpretation of the solicitation issued," rather than disputes of material fact. *Banknote Corp.*, 365 F.3d at 1352. The Federal Circuit has described its "'task'" of "'address[ing] independently any legal issues, such as the correct interpretation of a solicitation,'" as part of its reapplication of the same APA standard used by our court in bid protests. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (quoting *Banknote Corp.*, 365 F.3d at 1353). The Court concludes that it has the duty to determine independently any questions of law, such as the correct interpretation of a solicitation, that must be addressed in bid protests.

**D.  The GAO's Recommendation Relating to the Build-to-Budget Language**

One GAO recommendation followed by the Corps concerned the offerors' understanding of the manner in which price was to be evaluated in the procurement.  The GAO found that "offerors were misled as to how price would be considered," AR, Tab 71 at 17459, and recommended that the Corps amend the solicitation with regard to the build-to-budget language to clarify that the agency would consider offers priced lower than the budget amount.  *Id.* at 17469-70.  In support of this conclusion, the GAO pointed to the fact that four out of five offerors submitted initial proposals priced at exactly $700 million, which the GAO believed should have indicated to the agency that only CBY understood that it could offer a price below the budget amount.  *Id.* at 17458.  Additionally, the GAO noted that the Corps never told offerors in discussions that offers below the budget amount "would be favorably considered," *id.*, and appears to have accepted Bechtel's and PCCP's arguments that they would have "allocated resources differently and submitted different proposals" if they had understood that prices under $700 million would be accepted.  *Id.* at 17459.

Plaintiff argues that this recommendation was arbitrary and capricious because the RFP language did not expressly require that all offerors bid exactly $700 million, prohibited offerors from proposing prices in excess of $700 million but did not exclude offers below that amount, and included phrases such as "within the budget amount."  Pl.'s Br. at 2, 37-39.  CBY further contends that the GAO's interpretation is irrational because mandating a set price for the proposals would have violated the FAR requirements for source selection, best-value tradeoff analysis, and price evaluation, as well as statutory requirements that agencies include cost as an evaluation factor.  *Id.* at 39-45.  CBY also argues that Bechtel and PCCP failed to demonstrate competitive prejudice, *id.* at 46-48, and that the GAO failed to address whether the protestors' reading of the RFP was a patent ambiguity which should have been challenged earlier.  *Id.* at 48-49.

In the GAO proceeding, Bechtel and PCCP alleged that offerors believed that the RFP required them to propose the full budget amount, and that either the agency deviated from the solicitation by accepting CBY's proposal or by giving CBY credit for offering less than $700 million, or the fact that offerors could propose less than $700 million was non-public information to which only CBY had access.  *See* AR, Tab 44 at 15075-80; AR, Tab 45 at 15210-12; AR, Tab 49 at 15707-16, 15717-22; AR, Tab 50 at 15826-32.  Before this Court, the agency now defends the GAO finding that both the RFP language and the fact that four out of five offerors initially proposed exactly $700 million indicate that offerors were misled regarding how price was to be evaluated.  Def.'s Br. at 46-50.  Intervenors argue that the Corps's decision to follow the GAO recommendation to change the build-to-budget language is rational because the RFP language misled them into believing proposals below $700 million would not be viewed favorably, and they therefore structured their proposals without understanding the agency's "true preferences" regarding price.  PCCP's Br. at 41-43; Bechtel's Br. at 41-45.

If the Court were called to address the proper interpretation of the solicitation, a question of law, *see Banknote Corp.*, 365 F.3d at 1352-53, it would have little difficulty concluding that offers below the $700 million limit were not only acceptable but, *ceteris paribus*, better than $700 million offers.  In contrast to offers that "exceed the contract budget," which the

solicitation made clear "*will be eliminated* from the competition without further consideration," AR, Tab 4 at 715, 758 (emphasis added), the most that was said regarding prices below budget was "[a]ttempts to offer lower priced technical solutions *may be determined non-competitive* and result in elimination accordingly." *Id.* at 1223, 1232 (emphasis added). In stressing that the Corps "desires to maximize the best value obtainable for that amount," and that "[o]fferors should strive to propose the best technical/management solution within that budget amount," AR, Tab 4 at 715, 758, the Corps seems to have been emphasizing the risks involved in sacrificing technical quality, as "non-cost factors are significantly more important than price." *Id.* at 1223, 1232; *see also id.* at 758. Thus, the Corps was not expressing its distaste for a lower price but rather lower quality: "Technical/management approaches that *seek to trade off performance* in favor of costs below the contract budget amount are not desired and will not be rewarded." *Id.* at 715 (emphasis added); *see also id.* at 758.

As the Corps explained, the build-to-budget approach of the solicitation concerns the use of a ceiling and the prioritization of quality, as it is "a method to help owners ensure *proposed prices are affordable* while further enhancing the *focus on technical excellence* instead of proposed initial cost." AR, Tab 4 at 1223, 1232 (emphasis added). Although the agency "expect[ed] our solutions to utilize the full budget available and not focus on providing a low bid design," it also noted "that Government acquisitions *must use price* as a factor." *Id.* (emphasis added). The solicitation accordingly identified price as a factor, *id.* at 757-58, 769, 776, 778, 781, and informed offerors that the "[a]ward shall be made utilizing the Best Value Continuum using the Tradeoff process prescribed by" FAR section 15.101-1. AR, Tab 4 at 754, 776. Since these tradeoffs by definition are decisions whether a lower price justifies accepting lower technical quality, or higher technical quality warrants paying a higher price, *see* 48 C.F.R. § 15.101-1(a), (c), they require the possibility that there may be differences in price among offerors, and rest (to the great relief of taxpayers, no doubt) on the notion that lower prices are better than higher prices. As far as the interpretation of the solicitation is concerned, the Court concludes that the only reasonable reading of the build-to-budget language is that the stated budget amount is only a ceiling, and not a floor.[32]

The government and intervenors, however, accurately point out that the GAO did not render an interpretation of the solicitation's build-to-budget language, but rather made the finding that offerors were misled by the solicitation's language and (in Bechtel's case) by the contracting officer's retraction of an oral statement. *See* Def.'s Br. at 46-50; PCCP's Br. at 41; PCCP's Supp'l Br. at 10-15; Bechtel's Br. at 41-43.[33] The GAO noted the solicitation language

---

[32] The Court does not find that the Corps's failure to correct the inaccurate premise of a question from an offeror --- that a proposal that would have been below budget can be made "compliant" by an "offeror simply includ[ing] betterments and increas[ing] its estimate of costs until it equals the stated budget amount," AR, Tab 4 at 1412 --- somehow incorporates that premise into the solicitation. The offeror was looking for a way *to exceed* the budget amount, and was tersely instructed: "The Offeror's proposal must comply with the RFP requirements." *Id.*

[33] The GAO's passing reference to "the RFP's express direction not to offer a lower price," AR, Tab 71 at 17465, in the portion of its decision concerning the OCI allegations, does not constitute an interpretation of the solicitation, at least for purposes of the build-to-budget finding and recommendation.

stressed by the intervenors, and summarized the Corps's positions (at that time) that the best value language adequately notified the parties of the treatment of price and that ignoring price would violate CICA.  AR, Tab 71 at 17458.  But its determination was of a factual nature --- inferring that the reason four of five offerors initially proposed prices of $700 million "appears to be tied to the above-quoted language in the RFP advising offerors that the agency expected them to use the full budgeted amount of $700 million for their projects," and concluding from this that "it should have been apparent to the Corps that only CBY understood that it was allowed to propose a price below the stated budget amount."  *Id.*

The GAO further noted that during the discussions the Corps "never advised" offerors "that offers below the build-to-budget amount would be favorably considered."  AR, Tab 71 at 17458.  And it added that "the Corps has not rebutted Bechtel's allegation that during discussions, the contracting officer initially informed Bechtel that a lower price would be favorably received, but then, after a recess, expressly retracted that statement, advising Bechtel that the prior statement was made in error."  *Id.* at 17458-59.  Based on these facts, the GAO found "that offerors were misled as to how price would be considered in this procurement" and recommended "that the agency amend the solicitation to clarify this matter."  *Id.* at 17459.

The Court finds the GAO's treatment of this issue as a question of fact somewhat problematic and inconsistent.  At the outset of the hearing, the GAO hearing examiner explained: "[T]here are some issues that I identified that I think are questions of law.  One of them is the build to budget question, and that's not going to be discussed at the hearing."  AR, Tab 52 at 16116.  Thus, although the contracting officer --- the other participant in the Bechtel conversation, *see* AR, Tab 44 at 15138 --- testified at the hearing, he was not given the opportunity to address this purportedly "not rebutted" allegation.  *See* AR, Tab 52 at 16310-23.  But in any event, the Court recognizes that a rational conclusion that offerors were misled might be supported by the thin reed of fact that four of five offerors submitted proposals at exactly $700 million (although the conclusion that this resulted from offers bumping against a tight ceiling is much more plausible).  This, however, does not resolve the rationality of the build-to-budget determination, as the Court finds that this is one of the rare cases in which "the agency 'entirely failed to consider an important aspect of the problem.'"  *Ala. Aircraft*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

The "important aspect" that was not considered concerns *what* the offerors were purportedly misled into believing.  If the offerors believed they were not "allowed to propose a price below the stated budget amount," AR, Tab 71 at 17458, and the solicitation clearly stated that "[o]ffers that exceed the contract budget will be eliminated from the competition without further consideration," AR, Tab 4 at 758, then this means that the misled offerors thought that every offer must be at exactly $700 million.  This, however would effectively eliminate price as a factor --- prices themselves are just numbers, and if all the numbers are the same, there can be no comparisons and no distinctions.  A process in which all prices *must be* the same is one in which price does not matter, running afoul of CICA and the FAR.

Congress has mandated that in prescribing the evaluation factors for competitive proposals, an agency "shall include cost or price to the Federal Government as an evaluation

factor that must be considered in the evaluation of proposals." 10 U.S.C. § 2305(a)(3)(A)(ii) (2006); *see also* 41 U.S.C. § 3306(c)(1)(B) (Supp. IV 2011).  Solicitations must include

> at a minimum . . . all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating sealed bids (including price) or competitive proposals (including cost or price, cost-related or price-related factors and subfactors, and noncost-related or nonprice-related factors and subfactors). . .

10 U.S.C. § 2305(a)(2)(A)(i) (2006); *see also* 41 U.S.C. § 3306(b)(1)(A) (Supp. IV 2011).[34]  The FAR also requires that the agency include cost as a factor in the solicitation and evaluate price as a factor in making procurement determinations --- stating that although the evaluation factors applying to an acquisition are within the broad discretion of agency officials, "[p]rice or cost to the Government shall be evaluated in every source selection."  48 C.F.R. § 15.304(c)(1)(2011).  Indeed, the contracting officer's "primary concern is the overall price the Government will actually pay."  48 C.F.R. § 15.405(b)(2011).

The Federal Circuit has recognized that "[p]rice (or cost) must always be a 'factor' in an agency's decision to award a contract," and that in a tradeoff analysis the importance of price "must not be discounted to such a degree that it effectively renders the price factor meaningless." *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993).  Even where, as in the case at issue here, the solicitation stipulates that non-price factors are more important, price must remain a meaningful factor in the SSA's decision-making when conducting a trade-off analysis of competing proposals.  *PlanetSpace, Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Lockheed Missiles*, 4 F.3d 955, 959).  This court has also interpreted both CICA and the FAR to require that agencies evaluate price as a factor when determining what to buy and which proposal to accept in negotiated procurements.  *Glenn Def. Marine (ASIA) PTE, Ltd. v. United States*, 97 Fed. Cl. 311, 320 (2011); *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 491 (2008) (recognizing that CICA and the FAR indicate Congress intended price competition to play a meaningful role in government contracting decisions).  Price must not be relegated to a "nominal evaluation factor" or "a mere consideration" in determining an offeror's eligibility for award, but must be given meaningful consideration.  *Serco*, 81 Fed. Cl. at 491 ("[A]n evaluation that fails to give price its due consideration is inconsistent with CICA and cannot serve as a reasonable basis for an award.").

Moreover, the GAO itself has recognized on several occasions that CICA requires agencies to include cost as a factor that must receive "meaningful consideration" in the evaluation of proposals.  *MIL Corp.*, B-294836, 2005 CPD ¶ 29, 2004 WL 3190217, at *7 (Comp. Gen. Dec. 30, 2004).  Consideration is not meaningful when price is minimized to the extent of being only a "nominal" evaluation factor.  *Id.* at *7; *see also Eurest Supp. Servs.*, B-285882.4, 2003 CPD ¶ 139, 2001 WL 34118414, at *6 (Comp. Gen. July 3, 2001) (stating that evaluations which fail to give "significant consideration" to cost are "inconsistent with CICA

---

[34]  In a two-phase design-build procurement like the Permanent Canal project, cost or price is omitted from phase one, but required as an evaluation factor in phase two.  *See* 10 U.S.C. § 2305a(c)(2)-(4); 41 U.S.C. § 3309(c)(2)-(4)(Supp. IV 2011); *see also* 48 C.F.R. § 36.303-2(b).

and cannot serve as the basis for a reasonable source selection"); *Electronic Design, Inc.*, B-279662.2, 99-2 CPD ¶ 69, 1998 WL 600991, at *5-6 (Comp. Gen. Aug. 31, 1998) (finding the agency did not give significant consideration to cost when evaluation minimized its potential impact by not considering the relative differences in price among proposals, thus making price a nominal evaluation factor).

If the build-to-budget language in the solicitation were construed to mean that all offerors' prices would be the same, then price would not even be a nominal consideration --- it would be eliminated as a factor, in violation of CICA and the FAR.  Although the solicitation, when identifying the price factor, noted that price "will be evaluated for reasonableness" in accordance with FAR section 15.404-1, *see* AR, Tab 4 at 769, 778, 781, the Court is not convinced that such evaluation alone satisfies the requirement that price be a factor.  As the GAO has persuasively explained, "[t]he statutory requirement to consider offerors' proposed prices in an agency's selection determination is not satisfied by the agency's determination that all proposed prices are reasonable, because a price reasonableness determination accords no relative weight to price in determining which offer represents the best value to the government." *Sturm, Ruger & Co.*, B-250193, 93-1 CPD ¶ 42, 1993 WL 17603, at *3 (Comp. Gen. Jan. 14, 1993).

Although the GAO decision acknowledged the Corps's argument that the intervenors' interpretation of the solicitation would violate CICA, it entirely failed to consider this point.  *See* AR, Tab 71 at 17458-59.[35]  But it is not reasonable for an offeror to believe that the statutory requirement that price be an evaluation factor may be dispensed with by an agency.  *Cf. Centech Grp.*, 554 F.3d at 1039 (holding that agencies may not informally alter the procurement requirements set in statutes and regulations).  If any of the offerors truly believed the solicitation mandated that all offers be priced at exactly $700 million, the offeror would have had a duty to challenge such an illegal term before submitting its proposal.  *See Blue & Gold Fleet*, 492 F.3d at 1313-15.  Even if an offeror felt that the consideration of price was ambiguous, because of the presence of the best value tradeoff language, this would have been a patent ambiguity requiring challenge prior to proposal submission.  *See id.*[36]

The GAO did not consider the legality of an evaluation scheme that removed price as a factor, the objective reasonableness of believing that such a scheme was prescribed, or the timeliness of any challenges based on such a scheme.  Its determination "that offerors were misled as to how price would be considered in this procurement," AR, Tab 71 at 17459, thus

---

[35] Indeed, the footnote in which the GAO disclaimed any opinion on the meaning of the build-to-budget language stated that it "express[ed] no opinion with respect to the *wisdom* of the build-to-budget approach," and did not even reference its *legality*.  AR, Tab 71 at 17459 n.15 (emphasis added).

[36] Contrary to the government's contention, *see* Def.'s Br. at 53, this conclusion is not undermined by our court's decision in *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 (2003).  Although *Gentex*, which predated *Blue & Gold Fleet* by three and one-half years, concerned the problem of a "lack of clarity in the RFP" regarding which purported requirements needed to be met, it involved no question of the legality of terms nor was there a determination of whether any ambiguities were patent or latent.  *See id.* at 650-52.

lacks a rational basis, and it was not rational for the Corps to have based corrective action on the corresponding GAO recommendation.

**E.  The GAO's Recommendation Concerning the Agency's Evaluation of CBY's Technical Proposal**

As the Court has dismissed plaintiff's claims relating to the GAO's recommendation of a further OCI investigation --- a recommendation which the government concedes cannot in any event support the rest of the corrective action, *see* Def.'s Br. at 30; Tr. at 141 --- and has determined that the GAO was arbitrary in recommending corrective action based on the purportedly misleading build-to-budget language, the Corps's non-OCI corrective action must stand or fall on the GAO's decision regarding the evaluation of CBY's foundation.  Concerning this issue, the GAO interpreted the solicitation as requiring that the evaluation of the technical proposal include a review of the referenced supporting documentation (drawings and calculations), and determined that the Corps failed to "meaningfully evaluate[ ]" whether CBY's foundation design would meet certain solicitation requirements.  AR, Tab 71 at 17456-57.  As was discussed above, *see* Section II.C *supra*, the interpretation of a solicitation is a question of law, independently determined by the Court.  *See Banknote Corp.*, 365 F.3d at 1352-53.

*1.  Did the RFP Require Review of the Supporting Documentation?*

In interpreting the solicitation, the GAO began by noting that the RFP specifically incorporated the Corps's HSDRRS Design Guidelines.  AR, Tab 71 at 17453 (citing AR, Tab 4 at 834, 852).  It cited the instruction that offerors address each factor "'in sufficient detail to permit a complete and comprehensive evaluation.'"  *Id.* (quoting AR, Tab 4 at 758).  The GAO also noted that submission requirements for Factor 1, sub-factor 1 instructed offerors to provide "adequate design provisions to account for structural design loads," and that "at a minimum" offerors were required to describe their "'[f]oundation and basis of major structural component design(s), including design provisions for minimizing and accommodating settlement.'"  *Id.* (quoting AR, Tab 4 at 759).  And it emphasized that under sub-factor 1 of the technical approach, concerning pump station operation, offerors were told that each "'proposal will be evaluated with respect to the ability of the Offeror's solution to provide . . . for each outfall canal . . . [s]torm surge barrier protection . . . with specific consideration of . . . [a]dequate design provisions to account for structural design loads'" and "'[c]ontinuous evacuation of water from the canals . . . with specific consideration of . . . [a]dequacy of design provisions to account for structural design loads.'"  *Id.* at 17453-54 (quoting AR, Tab 4 at 776).

The GAO determined that the solicitation required the evaluation of supporting documentation, contained in Volume IV of the proposals, when this documentation was referenced in the technical proposal.  It found this approach to be required because the RFP "expressly required that offerors explain their technical approach."  AR, Tab 71 at 17456.  The GAO noted that the solicitation expressly provided "that offerors could reference the supporting documentation volume to respond to the RFP's requirement that offerors explain their technical approach."  *Id.* at 17456 n.12 (citing AR, Tab 4 at 760).  It acknowledged that the RFP described Volume IV as "Not Evaluated," but also noted that because the RFP specifically stated the contents of Volume IV would be used "'as supporting documentation during the evaluation as

referenced,'" the Corps was required to incorporate Volume IV materials in its evaluation at least to that extent.  *Id.* (quoting AR, Tab 4 at 771).  Thus, the GAO concluded that the evaluators "did not need to separately evaluate" the contents of Volume IV "except to the extent that relevant portions of that volume were referenced" in Volume I.  *Id.*

Plaintiff argues that because this was a design-build contract, there was no need for detailed analysis of CBY's foundation design prior to award, and that offerors only had to include "design concepts" in the proposal rather than the full design.  Pl.'s Br. at 29, 76-78 (citing 48 C.F.R. §§ 36.303-2(a), 36.102).  CBY contends that the RFP language did not require detailed design review and highlights the fact that the RFP included a section called "Design After Award," which described the various design packages the awardee would later produce for evaluation.  Pl.'s Br. at 30 (quoting AR, Tab 4 at 927).  According to CBY, the RFP did not require the technical evaluators to conduct a detailed evaluation of CBY's design, or of the calculations submitted in Volume IV, because the design-build process contemplated that a more detailed evaluation would be conducted after award.  Pl.'s Br. at 29, 75-80.  Thus, CBY argues that GAO "impermissibly substituted its judgment for that of evaluators with technical expertise" when it determined that the Corps did not properly evaluate CBY's design.  *Id.* at 75.

In construing the terms of a solicitation, the document must be considered as a whole and interpreted in "a manner that harmonizes and gives reasonable meaning to all of its provisions."  *Banknote Corp.*, 365 F.3d at 1353; *NVT Techs.*, 370 F.3d at 1159.  Looking closely at the terms of the solicitation, and considering the arguments of the parties, the Court concludes that the GAO's interpretation of the solicitation's evaluation method is correct.  First, plaintiff has identified nothing in the design-build statute, *see* 10 U.S.C. § 2305a, or the FAR provisions implementing it, *see* 48 C.F.R. §§ 36.300—36.303-2, which indicates that the design concepts being reviewed need not meet solicitation requirements.  Second, turning to the RFP, while the requirements for Factor 1, sub-factor 1 did not state specifically how the foundation design would be evaluated, the solicitation did specify that an offeror must demonstrate that its approach provided "storm surge barrier protection" as required by the Statement of Work and that, in doing so, offerors should give specific consideration to "adequate design provisions to account for structural design loads."  AR, Tab 4 at 759.  The RFP required offerors to provide in Volume I "a narrative that summarizes their proposed technical solution," and allowed them to submit drawings and technical data in Volume IV which "can be referenced as required."  *Id.* at 759, 760.  The RFP specified that Volume IV must be labeled "Supporting Documentation," and that it "shall include the design information for each [Permanent Canal Closure and Pump] any additional information that is needed to clearly illustrate the scope and approach of [the] proposal."  AR, Tab 4 at 771.  In its overview of the content of each volume, the RFP described Volume IV as "Attachment A (Not Evaluated)," AR, Tab 4 at 757, yet the RFP also stated that the contents of Volume IV "will be used as supporting documentation during the evaluation, as referenced by the proposal."  AR, Tab 4 at 771.

In the RFP's description and instructions for Volume IV, offerors were told that by submitting drawings and key design data in Volume IV "the Offeror is certifying that the items are in compliance with all the requirements of the RFP."  AR, Tab 4 at 771.  Following that statement, the RFP instructed that drawings should be developed "to an appropriate level to facilitate pricing and to clearly convey the intended approach and proposed scope of work."  *Id.*;

*see also id.* at 773.  The description of Volume IV also indicated that "[f]oundation plans, including details for piles and piers" should be included in the sub-section entitled "Structural Drawings."  *Id*. at 771.  It is true that the design-build contract under this procurement entails finalizing the design after award, *see* AR, Tab 4 at 927-45, and that among the required design packages the awardee must submit are separate "Foundation and Substructure" packages for each canal, *id*. at 927, but offerors were also instructed that "[t]he Technical proposal shall address the Offeror's proposed approach *to fully perform the requirements of the RFP*."  *Id*. at 758 (emphasis added).  Taking the foregoing into account, the Court concludes that a two-phase design-build contract does not call for an "award-first, evaluate later" process.  Offerors were to submit design concepts that met the requirements, explained in a brief technical proposal that could reference supporting documentation in another volume.  When materials in Volume IV are referenced in the technical proposal as supporting the proposal's meeting of requirements, those materials must be reviewed as part of the evaluation of the technical proposal.

### *2.  Was the GAO Arbitrary in Concluding that the Corps Did Not Meaningfully Evaluate CBY's Foundation Design?*

Having concluded that the GAO was correct in its interpretation of the RFP, the next question to be considered is whether the GAO was arbitrary in determining that the Corps departed from the solicitation's terms and thus failed to meaningfully evaluate CBY's foundation design.  *See* AR, Tab 71 at 17457.  As discussed above, intervenors Bechtel and PCCP filed protests with the GAO challenging the award to CBY, arguing that the Corps improperly evaluated CBY's technical proposal.[37]  AR, Tab 44 at 15067-68; AR, Tab 45 at 15179-80.  Bechtel maintained that CBY's foundation design with [XXX] was insufficient to withstand lateral loading as required by the HSDRRS Design Guidelines.  AR, Tab 49 at 15693, 15696-15700.  During the hearing, the GAO heard testimony on this issue from Bechtel's expert, Mr. Masucci, and from [Mr. X], the chair of the technical evaluation team.

As we have seen, the RFP specified that portions of Volume IV would be involved in the evaluation when referenced by the technical proposal, and CBY's proposal referenced Volume IV materials on several occasions.  For example, after asserting that its [XXX] were all designed according to the requirements in the RFP and the HSDRRS guidelines, the proposal then specified that the "[s]tructural drawings for all major components are included in Volume IV-A," and that its "[d]esign criteria and [XXX] are provided in Volume IV-C, under Hurricane Resistance Design Data and Related Information."  AR, Tab 7 at 6587.  After stating that flood walls would be designed and constructed to achieve the necessary stability and lateral deflection limits in accordance with the RFP and guidelines, CBY's proposal further stated that its "[XXX] are included in Volume IV."  AR, Tab 7 at 6588.  Based on such language, the GAO rationally concluded that these references were specific enough to warrant the agency's review of the relevant supporting documentation in its evaluation of the foundation design.

---

[37]  Bechtel and PCCP raised several other allegations about CBY's technical proposal, but only the issues on which the GAO sustained the protests, and which CBY now challenges in this Court, are relevant to this case.

Because there was no contemporaneous record of how the technical evaluation was conducted, the GAO mainly based its assessment of that evaluation on the hearing testimony, particularly that of [Mr. X].  *See* AR, Tab 71 at 17453-57.  The hearing officer informed the parties that they would need to provide witnesses to address the technical issues raised in the protests, AR, Tab 71 at 17455, yet of the seven people on the technical evaluation team, [Mr. X], the chair of the technical evaluation team, was the only one to testify about the foundation design issue and the use of Volume IV in the evaluations.[38]  *See* AR, Tab 52 at 16224-25.  At the prehearing conference, the hearing officer asked agency counsel whether [Mr. X] would be able to discuss "anything that the SSEB evaluated," and the agency counsel answered that he was the witness "we think is best to address this."  AR, Tab 52 at 16262.[39]  The hearing officer also expressed concern that the Corps had only provided two witnesses from the evaluation team.  AR, Tab 52 at 16118.[40]

At the hearing, [Mr. X] explained that each technical evaluator first reviewed each proposal individually, and then the evaluators discussed the proposals in what they called "a round table" in order to come to a consensus regarding the strengths, significant strengths, weaknesses, significant weaknesses, or deficiencies of the offerors.  AR, Tab 52 at 16225-26.  Mister [X] did not remember any discussion among the evaluators about CBY's foundation design or about any issues associated with the pile foundation and lateral loading.  AR, Tab 52 at 16251, 16254, 16255-56.  On cross-examination he indicated that the ability of CBY's proposed structures to withstand the lateral loading was "not specifically evaluated during the evaluation" and said it did not come up in discussion.  *Id*. at 16254.  When asked whether CBY's references to Volume IV caused the evaluators to "actually consider" or analyze its contents, [Mr. X] testified that he personally did not do so, and that he did not know what the other evaluators did regarding the Volume IV data.  *Id*. at 16255, 16257.  According to [Mr. X]'s testimony, because the evaluators were preoccupied with strengths and weaknesses, they only consulted Volume IV when the evaluators had already identified a strength or weakness in the Volume I proposal itself.  *Id*. at 16257-58.  He explained that this was because the evaluators viewed the design-build concept as providing for more complete evaluation after award, and that "unless [they] saw a problem with something, [they] wouldn't research it f[u]rther."  *Id*. at 16257-58.  The GAO found that this approach of reviewing Volume IV only *after* coming to conclusions about

---

[38]  The Corps called one other member of the team, a hydraulics expert named [Mr. Z], to testify about the hydraulics issue, but [Mr. X] was the only one to address the technical evaluation process.  The GAO decision noted that the agency provided only one witness ([Mr. X]) who was a mechanical engineer and who professed an inability to testify about the foundation issues raised in Bechtel's protest.  AR, Tab 71 at 17455 n.10.  The contracting officer, Mr. Black, testified mainly about the overall process and other issues not related to the evaluation of CBY's design or Volume IV materials.  *See* AR, Tab 52 at 16310-23.

[39]  It appears from the transcript that CBY had an expert at one point named Mr. Dyhouse, but nothing in the record indicates why he did not testify at the hearing.  *See* AR, Tab 52 at 16142.

[40]  The GAO hearing examiner implied that she may not have allowed the entire seven-member team to testify, *see* AR, Tab 52 at 16262, but the record does not indicate that either CBY or the agency made an attempt to call other technical evaluators as witnesses.

Volume I was inconsistent with the RFP, and reiterated the problem of having no contemporaneous record showing how the evaluation team used Volume IV. AR, Tab 71 at 17455 n.11. The GAO also noted that the agency did not explain how evaluators could reasonably determine strengths and weaknesses without first reviewing the supporting documentation.[41] *Id.*

Mister [X] also testified that he remembered a discussion about the piling arrangement, but that the discussion only concluded that "it looked reasonable" and that the design would become more detailed after award. AR, Tab 52 at 16255. He said that he believed the discussion about the piles during Phase I involved all seven evaluators and that the discussion lasted perhaps five minutes "if it was that long." *Id.* at 16255-56. Later he testified that there was no discussion about the foundation design "other than it looked reasonable." *Id.* at 16261-62. In response to further questioning about the extent to which CBY's Volume IV was evaluated, he repeatedly testified either that he did not know, did not remember, or could not speak for what the other evaluators did. *Id.* at 16254, 16255, 16257, 16259, 16277, 16278. When asked to explain his understanding of a [XXX] connection, he answered, "I do not know what that is." *Id.* at 16259.

The GAO noted that Bechtel's expert, Mr. Masucci, testified that CBY's drawings in Volume IV showed that CBY's design was based on a [XXX], AR, Tab 52 at 16136, 16284-85, and that although the guidelines allowed for either a pinned or fixed connection, CBY's design was inconsistent with [XXX] which purported to show the design met the HSDRRS Design Guidelines --- as these [XXX] were based on [XXX], which would purportedly be [XXX]. AR, Tab 52 at 16284, 16287; AR, Tab 71 at 17454. The GAO decision emphasized that this testimony was not rebutted by the agency or by CBY. AR, Tab 71 at 17454-55 & n.9.

From the foregoing, the Court concludes that the GAO had a rational basis for its determination that the Corps failed to meaningfully evaluate CBY's foundation design. Bechtel's expert testified that based on the referenced supporting documentation in CBY's Volume IV, one could conclude that the design was inadequate to meet the RFP requirements under the HSDRRS Design Guidelines. Nothing in the record indicates that the technical evaluators specifically considered this information and reached the opposite conclusion. The evaluation summaries provided in the record do not indicate whether or to what extent CBY's Volume IV drawings [XXX] were evaluated. Mister [X] testified before the GAO that each evaluator "individually reviewed the packets or the proposals" and that "[e]ach one did it a little bit different[ly]." AR, Tab 52 at 16225. Unfortunately the record does not contain any individual evaluator worksheets or notes that would indicate what the evaluators actually looked at or evaluated, nor does it contain any notes or worksheets that reflect the extent to which evaluators analyzed the proposals.[42] With no documents illuminating the evaluation process in

---

[41]  When asked about handling inconsistencies between the data in Volume I and Volume IV, [Mr. X] answered, "You would probably have to ask Tim Black, the contracting officer." AR, Tab 52 at 16259. No one, however, asked Mr. Black about that issue during his testimony. *See* AR, Tab 52 at 16310-23.

[42]  The Court assumes that the agency had ample opportunity and incentive to maintain, locate,

this regard, and the inability of the agency's witness to shed light on the matter, the GAO could reasonably conclude that the evaluation of the foundation design was not meaningful, *see* AR, Tab 71 at 17454-57, and the Court finds that the GAO "examine[d] the relevant data and articulate[d] a satisfactory explanation for its" decision. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. This conclusion does not mean that one could not find, based on the materials discussed at the GAO hearing, that CBY's foundation design met the requirements, or that other documentation in Volume IV would be insufficient to establish this. Nor can it be taken to mean that the evaluation of the other offerors' technical proposals was adequately meaningful in the same regard. Although the evaluation of CBY's technical proposal was the focus of the GAO decision, what the hearing revealed was an approach to the technical evaluation in general that was inconsistent with the solicitation.

### *3. Is the Corrective Action Justified Based on the Recommendation Concerning the Evaluation of Proposals?*

The Court, therefore, concludes that the GAO rationally determined that the Corps failed to properly evaluate CBY's foundation design (and, by implication, the technical proposals of all offerors) by not reviewing the referenced support drawings and calculations. It was therefore rational for the Corps to have followed the GAO recommendation that the Corps "conduct discussions with respect to the technical . . . issues raised in these protests if necessary, accept and evaluate revised proposals, and make a new source selection decision consistent with [the GAO] decision." AR, Tab 71 at 17470. Although CBY maintains that the "GAO's findings on their face called for no more than a re-evaluation," Pl.'s Br. at 35, had the Corps properly evaluated proposals, any weaknesses or deficiencies identified based on the relevant Volume IV materials would have been included in discussions and could have been addressed prior to the submission of final proposal revisions. Thus, the submission of revised proposals is appropriate.

The final question for the Court to consider is whether the Corps can reasonably bootstrap the RFP changes in the proposed corrective action to the need for revised proposals and evaluations. Although the offerors who misunderstood the build-to-budget language may have no *right* to have the language dropped from the solicitation, the Court is not aware of any restriction on the Corps's ability to do this, when the procurement is ongoing. While the confusion over this language may not be an independent ground for a stay of CBY's award and a resolicitation and new evaluation, this confusion may rationally be addressed by the Corps --- even if the Corps had no obligation to infer that the offerors harbored an unreasonable interpretation of the language, their subjective views are now certainly known and may be taken into account. *See East West, Inc. v. United States*, 100 Fed. Cl. 53, 57 n.5 (2011).

Moreover, in the context of an on-going procurement, it is reasonable, as the contracting officer concluded in the Determination and Findings following the third OCI investigation, to "[a]mend[ ] the RFP to more fully communicate the basis on which proposals will be evaluated," since this "renders moot any concern that Mr. Kendrick's access to this information and subsequent employment with CDM created an impermissible conflict of interest." AR, Tab 67 at

---

and include such documents in the record before the GAO if such documents existed.

17298; *see also* PCCP's Br. at 43-44.  And although the other RFP changes, relating to hydraulics issues raised in the GAO proceeding, would not warrant a resolicitation and could have been accomplished through a contract modification, *see AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993), the Court does not see any reason why they cannot be addressed, when revised proposals and a new evaluation have been deemed necessary.  Accordingly, the Court concludes that the entire corrective action has a rational basis, and defendant's and intervenors' cross-motions for judgment on the administrative record are **GRANTED**.  Plaintiff's motion for judgment on the administrative record is **DENIED**, and plaintiff's motion for a permanent injunction is **DENIED** for lack of success on the merits.  *See Tech Sys.*, 98 Fed. Cl. at 268; *Gulf Grp.*, 61 Fed. Cl. at 364.

### III.   CONCLUSION

For the foregoing reasons, the Court finds that the corrective action taken by the Army Corps of Engineers, following a recommendation of the GAO, was not arbitrary and capricious, but rather had a rational basis.  Defendant's motion to dismiss plaintiff's claims for lack of subject matter jurisdiction is **GRANTED-IN-PART**, insofar as the claims concern the third OCI investigation, and **DENIED** in all other respects.  Defendant's and intervenors' cross-motions for judgment on the administrative record are **GRANTED** and plaintiff's motion for judgment on the administrative record is **DENIED**.  The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge